James GUDERJOHN d/b/a J & J Enterprises, Plaintiff-Respondent,†

v.

LOEWEN-AMERICA, INC., a Delaware corporation, Defendant-Appellant.

Court of Appeals

*No. 91–2555. Submitted on briefs July 14, 1992.—Decided September 2, 1993.*

(Also reported in 507 N.W.2d 115.)

---

†Petition to review filed.

For the defendant-appellant the cause was submitted on the brief of *Maris Rushevics* of *Anderson, Shannon, O'Brien, Rice & Bertz* of Stevens Point.

For the plaintiff-respondent the cause was submitted on the brief of *Lester A. Pines* of *Cullen, Weston, Pines & Bach* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J.   Loewen-America, Inc. appeals from a judgment in favor of James Guderjohn, doing business as J & J Enterprises (J & J). The ultimate issue is whether, as the trial court concluded, Loewen granted a dealership to J & J. If so, then the Wisconsin Fair Dealership Law (WFDL) applies, Loewen's termination of J & J's dealership violated that law and the judgment must be affirmed. The dealership issue turns on the business relationship between Loewen and J &

J. The question is whether that relationship demonstrated the existence of "a community of interest" as defined in sec. 135.02(1), Stats.[1] We conclude that a community of interest does not exist, and we therefore reverse.

### 1. Analytical Methodology and Facts

■

For purposes of the WFDL, the elements of a dealership are, in summary, (1) an agreement between two or more persons, (2) by which one has granted certain rights to the other and (3) in which a community of interest exists in the business of offering, selling or distributing goods or services at wholesale or retail. *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 763, 300 N.W.2d 63, 70 (1981).

The first two elements of a dealership have been met. That is undisputed. The third element, a community of interest, is disputed. This element is troublesome and difficult to define with precision. *Zie-*

---

[1] The WFDL defines the terms "dealer," "dealership" and "community of interest" in sec. 135.02, Stats., as follows:

(1) "Community of interest" means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services.

(2) "Dealer" means a person who is a grantee of a dealership situated in this state.

(3) "Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

*gler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 600, 407 N.W.2d 873, 877 (1987).

The *Ziegler* court established an analysis to determine whether a community of interest has been demonstrated. To show a community of interest, there must be (1) a continuing financial interest and (2) "interdependence," *i.e.*, shared goals and a cooperative effort more significant than that in the typical vendor-vendee relationship. *Id.* at 604–05, 407 N.W.2d at 878–79. The analysis is intended to:

> [A]ssist courts in parsing the facts in an individual case and [to] help sharpen the focus of a court's inquiry into the existence of a community of interest between an alleged grantor and dealer without robbing the concept of community of interest of the flexibility which the legislature intended it to have.

*Id.* at 605, 407 N.W.2d at 879.

When, as here, the facts are undisputed or have been resolved by the trial court, whether the community of interest requirement has been met is a question of law. *Kania*, 99 Wis. 2d at 755, 758–59, 300 N.W.2d at 66, 68. We decide questions of law without deferring to the opinion of the trial court. *Green Scapular Crusade Inc. v. Town of Palmyra*, 118 Wis. 2d 135, 138, 345 N.W.2d 523, 525–26 (Ct. App. 1984).

To determine whether the parties have a continuing financial interest in their business relationship and whether it is so interdependent that a community of interest exists, the *Ziegler* court described ten "facets" of the relationship a court should examine, as evidenced in the actual dealing of the parties and their

agreement. *Ziegler*, 139 Wis. 2d at 605–06, 407 N.W.2d at 879–80. We examine those facets in light of the trial court's findings (and lack of findings) and the undisputed facts of record as follows:

The plaintiff Guderjohn is a sole proprietor, operating as J & J. The court made no finding regarding the number of J & J's employees. It is undisputed that during its relationship with Loewen, J & J had a part-time bookkeeper, a part-time service technician and added no staff.

The relationship with Loewen lasted just under four years before it was terminated. It began in August 1986 when the parties entered into an oral agreement by which J & J bought "NSM" juke boxes, parts and accessories from Loewen for resale to "operators" in Wisconsin. Loewen, a wholesaler, sold to J & J, a distributor, who sold to "operators" who placed machines at "locations," such as taverns. Loewen terminated the agreement in April 1990. Because J & J obtained a restraining order in June 1990 to maintain the status quo, the relationship has continued.

J & J concedes that it was not given an exclusive distributorship in Wisconsin.[2] Loewen set a yearly sales quota for J & J. The trial court found that Loewen granted J & J the right to use the NSM trademark and logo and referred to J & J as an authorized distributor. J & J displays the trademark and logo in its showroom, and it displayed the NSM banner and logo at state trade shows.

---

[2] The trial court found that, "Loewen granted J & J the right to distribute NSM juke boxes, parts and accessories within the state of Wisconsin." It also found, "When approached at a national trade show, Loewen directed persons interested in the product in Wisconsin to get it from J & J. Loewen refused to sell directly to operators, except in an unusual circumstance."

The record is silent regarding the percentage of time or effort that J & J devoted to Loewen's products. However, J & J sold other products as well, such as video games, dart games, pool table equipment and supplies, truck lift gates and swimming pool chemicals.

In early 1989, Loewen introduced a new NSM product, the Loewen compact disc juke box ("CD juke box"), to the market. The trial court describes the CD juke box as "the hottest item on the coin-operated machine market." Operators are attracted to J & J because of that juke box, and as a result they buy used equipment and J & J's other lines in addition to the NSM juke boxes. J & J's loss of the NSM juke box line would reduce its total sales and profits. The court found that had J & J not sold NSM CD juke boxes, J & J's 1989 gross profit would have been reduced by 7.21% and its 1990 gross profits would have been reduced by 14%.[3] The trial court found that termination of its relationship with Loewen would threaten J & J's economic health.

J & J paid nothing to Loewen to become its distributor. J & J initially invested $18,200 in juke boxes and added to that inventory over time. At the end of 1989 J & J had on hand about $20,000 in NSM machines, parts and accessories.

In 1987 Loewen developed a recommended NSM parts and accessories inventory list for distributors. To comply with that recommendation would cost a dealer $3,500 to $5,000. J & J was not required to comply.

[3] Loewen asserts that the 14% finding is clearly erroneous, but the trial court's computations are based partly on its assessment of the credibility of the witnesses. The trial judge is, of course, the ultimate arbiter of the witnesses' credibility. *Gehr v. City of Sheboygan*, 81 Wis. 2d 117, 122, 260 N.W.2d 30, 33 (1977).

When the CD juke box became available in 1989, Loewen developed a second recommended parts and accessories list for that product. To comply with the parts recommendation would cost an additional $2,000 to $2,500. Again, J & J was not required to comply.

It is undisputed that J & J's physical facilities consist of a metal pole building. The building predates J & J's relationship with Loewen, and J & J has not modified it. Guderjohn testified that at some point, Loewen suggested that J & J buy an "NSM CD Hide-Away, for purposes of testing for our customers." (The function of the equipment is not otherwise explained.) J & J agreed and paid Loewen about $1,800 for the equipment.

The trial court found that J & J has established goodwill for NSM products. Before J & J's distributorship, Loewen had a small market in Wisconsin for its juke boxes. J & J opened the market through telephone contacts and trade shows. It promoted and sold NSM machines at a competitive price to attract operators to the new brand of juke box in Wisconsin. Operators in Wisconsin have identified J & J with the NSM product.

J & J's total advertising expenses for all of its sales, Loewen and otherwise, were $140 in 1987, $438 in 1988, $1,233 in 1989, and $488 in 1990. Its gross sales were as follows: $526,000 in 1988, including $47,000 from sales of NSM products; $688,855 in 1989, including $182,877 from NSM sales; and $718,711 in 1990, including $139,700 from NSM sales. J & J has not advertised in national trade journals, local or state-wide newspapers, tavern league magazines or the yellow pages. It has displayed NSM products only at its own business location, three trade conventions and a tavern league show. Loewen furnished to J & J sales

literature, brochures, window stickers and a banner free of charge.

Nothing on J & J's building indicates that it distributes NSM products other than window stickers on the front and back glass doors and one on the main window. In 1990 J & J had two large signs in front of the building. One identified J & J as selling swimming pool chemicals and the other mentioned amusement games.[4] J & J has not used the NSM trademark or logo on its stationery, flyers, business cards or invoices.

The court found that J & J was responsible for supplementary services to its customers. It provided parts, service, consultation and assistance on installation and operation problems regarding the NSM juke boxes. Loewen provided feedback and suggestions to J & J about service, as well as technical support and advice and on-site training for operators in Waupaca.

The trial court found that Loewen had superior economic power over J & J due to the uniqueness of the CD juke box as a product line and the necessity for J & J, as an amusement device distributor, to have a CD line.

2. Financial Interest

We conclude that J & J has an insufficient financial interest to satisfy the statutory requirement of community of interest. We reach that conclusion, notwithstanding the fact that the sale of Loewen products has accounted for a substantial percentage of J & J's total revenues[5] and a substantial percentage of its

---

[4] Guderjohn testified that he did not recall if the second sign mentioned juke boxes or not.

[5] Nine percent in 1988, 26% in 1989 and 19% in 1990.

gross profits, and the percentage of its profits derived from Loewen products is relevant to the community of interest issue. *Ziegler*, 139 Wis. 2d at 607, 407 N.W.2d at 880. Although the percentages tend to show a community of interest, we must examine all facets of the relationship.

Financial investment is one such facet. *Ziegler*, 139 Wis. 2d at 607–08, 407 N.W.2d at 880. J & J's financial investment is minimal, at best. It paid nothing to acquire the distributorship. Its initial investment of $18,200 was for inventory, consisting of machines. There is no evidence that J & J cannot sell whatever Loewen inventory it had at termination. It spent nothing on physical facilities or equipment (other than the unexplained "NSM CD Hide-Away") in order to act as Loewen's distributor. *See Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419–20 (7th Cir. 1990) (no dealership when, among other things, vendee had no assets dedicated to selling the product); *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir. 1989) (dealership established when, among other things, dealer built customized shed to store goods). The trial court inferred that J & J incurred a cost when establishing goodwill but did not estimate the amount, and no evidence exists which would allow its quantification.

A substantial investment is not the only way to satisfy the community of interest requirement. *Ziegler*, 139 Wis. 2d at 608 n.10, 407 N.W.2d at 880 n.10. However, a substantial financial investment distinguishes a dealership from a typical vendor-vendee relationship. The typical vendee makes little or no investment except for inventory. If the relationship with its vendor is terminated, the vendee suffers only a loss of future

profits unless its inventory is unsalable. J & J's minimal financial investment other than easily sold inventory is a strong indication that it is a vendee rather than a dealer under the WFDL.

### 3. Interdependence

We turn to whether J & J established that a sufficient degree of interdependence exists to satisfy the community of interest test. One circumstance tends to show interdependence: J & J's development of "goodwill." Before Loewen took on J & J as a distributor, NSM's name was hardly well known in Wisconsin. Now it is, at least in a part of Wisconsin. Loewen's president agrees that when J & J became its distributor, NSM's name and brand were known in the Milwaukee area, in the northwest corner of Wisconsin near Minneapolis-St. Paul, and in the Green Bay area, but not in the "central, northwest, central area." He agrees that the NSM name has now become more well known in that area.

■

That J & J is permitted to identify itself with Loewen's trademarks and logos tends to show interdependence. *Ziegler*, 139 Wis. 2d at 606, 407 N.W.2d at 879. On the other hand, J & J's use of the logo and trademarks has not been great. While it has used a banner (provided by Loewen) at three trade shows, its advertising has been scant. *See Moore v. Tandy Corp.*, 819 F.2d 820, 823 (7th Cir. 1987) (no dealership when, among other things, investment was not one in "advertising materials that would become worthless if he ceased to sell the advertiser's goods."). Its annual advertising expense for *all* product lines it handles, Loewen and non-Loewen, has been low.

211

But other facets bearing on the interdependence issue outweigh the few facets favoring J & J's claim that a community of interest exists. *See Ziegler*, 139 Wis. 2d at 606, 407 N.W.2d at 879–80. It cannot be said that J & J has primary responsibility for the sale of Loewen's products in Wisconsin. J & J concedes it does not have an exclusive distributorship. *See C.L. Thompson Co. v. Festo Corp.*, 708 F.Supp. 221, 226 (E.D. Wis. 1989) (no dealership when, among other things, grant of territory was nonexclusive). No agreement exists that J & J must use its best efforts to promote the sale of Loewen products. It can and does sell many other products. *See Kenosha Liquor*, 895 F.2d at 420 (no dealership when, among other things, product was only one of several "magnet brands"). The parties do not cooperate in setting a sales target. Far from cooperating in this regard, Loewen "dictates" to J & J how many machines it should buy. That is how the trial court referred to J & J's quota. Nothing in their agreement requires J & J to provide a start-up or any other service for Loewen's products. J & J is not required to maintain parts inventories sufficient to satisfy the needs of Wisconsin customers. No agreement exists that it must provide a certain amount of personnel to sell or service Loewen's products. No evidence exists of reports and information that must be provided to Loewen. No periodic reviews of J & J's performance are required under its agreement with Loewen.

■

The *Ziegler* court held that "the duration of the relationship bears on the extent of interdependence in the business relationship." *Ziegler*, 139 Wis. 2d at 611, 407 N.W.2d at 882. J & J emphasizes the four-year duration of its agreement before Loewen terminated it. Four years was not enough, however, to induce J & J to

increase its facilities, acquire additional personnel, boost its advertising or follow Loewen's inventory recommendations. If duration has significance, it is this: J & J's distributorship did not last long enough to cement interdependence between the parties.

We have not overlooked the harm to J & J through loss of its Loewen distributorship. We have no doubt but that the harm described by the trial court will occur. But it will, as we have noted, result primarily from loss of Loewen revenue and profit to J & J, a loss which will occur in many terminated vendor-vendee relationships. This is also true of J & J's loss of non-Loewen product sales resulting from its loss of the Loewen line. The loss of one vendor's line may similarly affect a vendee's sales of other lines, but that interconnected loss does not necessarily create a dealership under the WFDL. *See Kenosha Liquor*, 895 F.2d at 420 (no dealership even though loss of one product may lead to reduced sales of others). The fact is that J & J's stake in its distributorship is primarily in future profits, and that is not enough to distinguish it from a typical vendee.

Moreover, just as a vendee's stake in its relationship with its vendor is frequently affected by its vendor's inherently superior bargaining power, that is not enough to create the "community of interest" required under sec. 135.02(1), Stats. Unlike a community of interest, which implies mutuality, superior bargaining power implies the ability to compel action to the possible detriment of the person claiming to be a dealer. Except to establish quotas, the record fails to show that Loewen compelled or even attempted to compel J & J to do anything. Rather, the record reveals a loose relationship between Loewen and J & J with no responsibilities (other than a quota) imposed on J & J,

and no losses to J & J from termination other than future profits.

4.   Conclusion

Having concluded that the community of interest required by sec. 135.02, Stats., does not exist, and that being the issue on which the appeal turns, we conclude that we must reverse the judgment of the circuit court.

*By the Court.*—Judgment reversed.