SALES & MARKETING ASSOCIATES, INCORPORATED, Plaintiff–Appellant,

v.

HUFFY CORPORATION, Defendant–Appellee.

No. 94–3837.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1995.

Decided June 19, 1995.

Daniel J. O'Brien (argued), Milwaukee, WI, for plaintiff-appellant.

Charles P. Graupner, Joshua L. Gimbel (argued), Michael, Best & Friedrich, Milwaukee, WI, for defendant-appellee.

Before CUMMINGS and RIPPLE, Circuit Judges, and WILL, District Judge.*

WILL, District Judge.

This is an appeal from cross-motions for summary judgment which the district court decided in favor of Huffy Corporation ("Huffy"). The district court held that Sales & Marketing Associates, Inc. ("Sales & Marketing") was not a dealer under the Wisconsin Fair Dealership Law ("WFDL") and therefore Huffy did not violate the statute when it terminated its relationship with Sales & Mar-

* The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

keting. Further, the district court concluded that Huffy did not breach the terms of its contract with Sales & Marketing when it terminated the contract. Sales & Marketing appeals both decisions. We affirm.

## BACKGROUND

Sales & Marketing is a Wisconsin corporation which promotes and sells products in the premium and incentive market. Unlike typical retail sales, this specialized field involves marketing products to companies who use the products as incentives for their salespeople or as premiums for marketing purposes. Huffy is a manufacturer of sports products. In 1987, the owner of Sales & Marketing, John C. Evans, wanted his recently incorporated company to represent a nationally recognized manufacturer and approached Huffy to explore the possibility of promoting Huffy's products. At that time, Huffy sold its products in many markets but had not entered the premium and incentive field.

In May of 1988, Sales & Marketing entered into a "Sales Representative Agreement" with Huffy. The agreement appointed Sales & Marketing as sales representative in the premium and incentive field, but not in the general retail market, for all Huffy sport products [1] in the United States. Huffy paid $10,000 at the outset to retain Sales & Marketing's services as an "independent contractor for sales solicitation and/or promotion of orders placed on Huffy." The $10,000 payment was intended to compensate Sales & Marketing for start up costs, including a study of the potential market, and other future expenses. Under the terms of the contract, Sales & Marketing received a ten percent commission on all sales.

Sales & Marketing began selling Huffy products in 1988. It solicited sales and submitted purchase orders for those sales to Huffy. Huffy then shipped the products directly to the customers. Huffy invoiced the three largest accounts itself. Together, these accounts constituted approximately 82% of the dollar value of the Huffy sales made by Sales & Marketing. Sales & Marketing invoiced the remaining smaller accounts as a service to Huffy, which allowed Sales & Marketing to handle a number of customer accounts which Huffy considered too small to maintain. In return for this service, Huffy reimbursed Sales & Marketing for the costs of invoicing. Sales & Marketing also engaged in collection activities involving the smaller accounts but paid Huffy for the products it invoiced only after the customer paid it. Huffy issued Sales & Marketing a customer number and a line of credit, and Sales & Marketing provided Huffy with a letter of credit to guarantee payments of the invoices on the smaller accounts.

Personnel at Sales & Marketing concentrated approximately twenty to thirty percent of their time on Huffy sales and devoted the rest of their time to the other twenty to twenty five lines with which it had sales agreements. None of Sales & Marketing's full-time employees were devoted exclusively to promoting Huffy products.

On average, Huffy products accounted for 23% of Sales & Marketing's gross revenue each year. However the exact percentage varied from year to year, with Sales & Marketing earning 13% of its gross profit from commissions on Huffy sales in 1988, 29% in 1989, 36% in 1990, 7% in 1991, and 32% in 1992.

The contract between the parties provided for immediate termination with cause or termination without cause upon 30 days written notice. On April 30, 1992, Huffy faxed Sales & Marketing a notice of immediate termination for cause, stating that it was dissatisfied with Sales & Marketing's performance. On May 1, 1992, Huffy entered into an agreement with Celtic Advertising ("Celtic"), Huffy's in-house advertising agency, to market Huffy's products in the premium and incentive field. Despite this new agreement, the evidence in the record indicates that Celtic did not make any sales within the thirty days after April 30, the date Huffy terminated the agreement, and that Huffy and Sales & Mar-

---

**1.** While the contract states that Sales & Marketing is a representative for *all* Huffy sports products, in actuality Sales & Marketing only sold basketball hoops, backboards, and related accessories.

keting continued to do business for several months afterward. Eventually, the business relationship between Huffy and Sales & Marketing terminated and Sales & Marketing filed the suit which lead to this appeal.

## DISCUSSION

■ We review a district court's grant of summary judgment *de novo* to determine whether the record establishes that the prevailing party was entitled to judgment as a matter of law. *Kornacki v. Norton Performance Plastics,* 956 F.2d 129, 130 (7th Cir. 1992). Wisconsin law governs in this diversity of citizenship action.

### A. *Wisconsin Fair Dealership Law*

Sales & Marketing's primary contention on appeal is that the Wisconsin Fair Dealership Law applies to the Sales Representative Agreement at issue in this case and that Huffy violated the WFDL by terminating that agreement without cause. The parties agree that the material facts surrounding their agreement are undisputed and that the issue of whether Sales & Marketing is entitled to the protection of the WFDL is a matter of law.

The WFDL protects dealers against unfair treatment by grantors and provides dealers with remedies in addition to those existing in contract or common law. Wis.Stat. § 135.025. Among other things, the WFDL mandates that a dealer receive 90 days notice before termination, and that a dealer be allowed 60 days to rectify any claimed deficiency. Wis.Stat. § 135.04. The WFDL applies only to those business relationships deemed "dealerships," which this court has recognized is a term of art defined under the WFDL as (1) a contract, (2) by which the dealer is granted the right to sell or distribute goods, or use a trade name, trademark or the like, and (3) in which there is a "commu-

nity of interest." *See Frieburg Farm Equipment Inc. v. Van Dale, Inc.,* 978 F.2d 395, 398 (7th Cir.1992), citing Wis.Stat. § 135.02(3).

The district court primarily based its decision that Sales & Marketing was not a dealer for the purposes of the WFDL on the ground that there was no community of interest between the parties. The WFDL defines "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). This court has noted on several occasions that this definition is "vague and unhelpful," *see, e.g., Frieburg,* 978 F.2d at 398, but both the Wisconsin Supreme Court and this court have provided further guidance to help determine whether the parties to an agreement have a community of interest. *See Ziegler Co. v. Rexnord, Inc.,* 139 Wis.2d 593, 407 N.W.2d 873 (1987); *Frieburg,* 978 F.2d at 398–99.

■ In *Ziegler,* the Wisconsin Supreme court approved a totality of circumstances approach, and laid out ten factors which courts should consider when making this determination.[2] This court has subsequently distilled the ten *Ziegler* factors into two broad considerations: the amount of revenue derived from the alleged dealership; and the amount of the alleged dealer's investments in assets, inventory, training, advertising, etc., which were not recoverable upon termination. *See Frieburg,* 978 F.2d at 399; *see also Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 419 (7th Cir.1990). As we recognized in *Frieburg,* "some combination of revenues and investments could manifest a community of interest, even if neither could standing alone." 978 F.2d at 399.

■ In this case, we must examine the combination of revenues and investments because, although Sales & Marketing relied in

2. The factors are: (1) the length of the parties' relationship; (2) the extent and nature of the obligations the contract/agreement imposes on the parties; (3) the percentage of time or revenue the alleged dealer devotes to the alleged grantor's products; (4) the percentage of gross profits the alleged dealer receives from the alleged grantor's products; (5) the extent and nature of grant of territory; (6) the extent and nature of alleged dealer's use of alleged grantor's trade-

marks or commercial symbols; (7) the extent and nature of alleged dealer's investment in inventory, facilities, and goodwill; (8) the personnel which the alleged dealer devotes to the alleged dealership; (9) the expenditure on advertising or promotions for the alleged grantor's goods; and (10) the extent and nature of supplementary services alleged dealer provides to consumers of alleged grantor's goods. *Ziegler,* 407 N.W.2d at 879–80.

part on the revenues received from Huffy sales, we do not believe that the reliance was so great that termination of the agreement necessarily threatened Sales & Marketing's economic health. A dealer entitled to WFDL protection should have a financial stake in the relationship large enough to make a grantor's power to terminate the agreement a threat to the economic health of the grantee. *Ziegler,* 407 N.W.2d at 879. Prior to *Ziegler,* the Wisconsin courts had taken a strict approach in evaluating whether a grantee's economic health would be threatened and often looked to see whether the grantee's economic livelihood was dependent upon the grantor. *See, e.g., Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 313 N.W.2d 60, 64 (1981).

In reaching its decision, the district court relied on the *Foerster* test, but we agree with Sales & Marketing that in *Ziegler* the Wisconsin Supreme Court at least implicitly rejected that test in favor of the totality of the circumstances test. On several occasions, we have found a community of interest when the percentage of revenue derived from the grantor's product has only been approximately ten percent of total revenues but other factors were also present. *See Frieburg,* 978 F.2d at 400. Here, Sales & Marketing derived on average 23% of its revenues from Huffy products. While Sales & Marketing certainly was not exclusively dependent on its relationship with Huffy, we agree that its relationship with a nationally recognized manufacturer and the revenues derived therefrom were significant to a relatively new business such as Sales & Marketing.

■ Because the percentage of revenues derived from Huffy sales is not alone dispositive of this case, we must examine the other characteristics of a community of interest. As discussed previously, this circuit has recognized the totality of the circumstances approach adopted in *Ziegler,* and of those factors has concentrated on whether the grantee has made sizable investments which are grantor-specific and therefore not fully recoverable upon termination. *See Frieburg,* 978 F.2d at 399–400. In determining whether the investments are grantor-specific, we look to see whether those investments are tied to the grantor's products and thus would be worth less in another use. *See id.,* citing

*Kenosha Liquor,* 895 F.2d at 419–20; *Moodie v. School Book Fairs, Inc.,* 889 F.2d 739, 742 (7th Cir.1989).

■ Sales & Marketing has failed to demonstrate that it made the sort of grantor-specific investments that ordinarily typifies a community of interest. It did not pay a franchise fee or make any investment in Huffy Corporation. Rather, Huffy paid it $10,-000 to get started selling Huffy products. Sales & Marketing purchased a limited supply of Huffy inventory, paid a relatively small amount for promotion of Huffy products ($5,978.44), and made no investments in assets specifically for the sale of Huffy products. Further, it paid Huffy only when it got paid by its customers and therefore bore a limited risk of credit loss.

Sales & Marketing notes that because of its relationship with Huffy it added staff, a larger facility and a larger computer system, but there is no evidence that these additions were tied solely to the marketing of Huffy products. None of Sales & Marketing's staff was devoted exclusively to selling Huffy products and there is no evidence that any special training was necessary to sell Huffy products. Likewise, Sales & Marketing failed to demonstrate that the larger facility or computer system were in any way Huffy-specific or were not adaptable to other uses upon termination of the agreement.

In fact, instead of Sales & Marketing paying Huffy to become a distributor of Huffy's products which is typical in dealership arrangements, as previously pointed out, Huffy paid Sales & Marketing $10,000 at the time of contracting, which Huffy contends was intended to save Sales & Marketing from having to make any investment in the relationship. Sales & Marketing alleges that this money was payment for a market study to determine the viability of Huffy sales in the field. However, this assertion is undermined by the language of the contract which states that the money was paid to retain Sales & Marketing's services.

Sales & Marketing's most compelling argument is that it had a unique relationship with Huffy, in contrast to Huffy's other relationships with its sales representatives, as evidenced by a significant amount of its grantor-specific, non-monetary investment in the

relationship. It argues that other Huffy representatives, and representatives in other WFDL cases, were grantees who sold in pre-established markets, which was not the case with Sales & Marketing. Sales & Marketing argues that it cooperated with Huffy on programs and promotions and that it developed the unique market which Huffy then exploited after terminating the relationship. In support of this contention, Sales & Marketing notes that it won a marketing award for its sales campaign, indicating that it created a market for the Huffy basketball products where there previously had been none. Furthermore, Sales & Marketing stresses that it invested time and effort in the development of goodwill and a customer base.

■ Huffy's relationship with Sales & Marketing was indeed unique in comparison with Huffy's other sales representatives and the relationships described in other WFDL cases. The special nature of the market development and the product are strong support for Sales & Marketing's arguments. However, Sales & Marketing fails to explain why the investment in market development, promotion development, and goodwill is so extensive and unusual as to bring it within the spirit of the WFDL. WFDL case law demonstrates that only a certain type of relationship is protected under it, and these cases all involve tangible financial investment. *See Kornacki*, 956 F.2d at 133 (holding that plaintiff was not a dealer because there was no financial investment, even though he spent a substantial amount of time developing customers and goodwill for the defendant).

Although Sales & Marketing will clearly suffer lost future profits as a result of the termination, Wisconsin courts have held that the threat of lost profits alone does not establish a community of interest. *See Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 507 N.W.2d 115, 120 (1993). Because Sales & Marketing has failed to establish any tangible financial loss other than lost profits arising from the termination of its agreement with Huffy, we conclude that the requisite community of interest was not present in this case.

■ Additionally, as the district court noted, it appears from the record that Sales & Marketing did not have the authority to commit Huffy to a sale. The WFDL does not protect a manufacturer's representative who lacks the "unqualified authorization to sell" or the authority to commit the grantor to a sale. *Foerster*, 313 N.W.2d at 64. Sales & Marketing's contract clearly and unambiguously states, "Huffy reserves the right to withhold acceptance of any order as in its judgment appears proper.... Representative is not an agent of Huffy for any purpose whatsoever and has no right or authority to assume or create any obligation, express or implied, on behlaf [sic] of or in the name of Huffy." This language is very similar to the contractual language in *Kornacki*, where this court held that the plaintiff had no authority to sell. *See* 956 F.2d at 132.

■ Sales & Marketing argues that Huffy never rejected a Sales & Marketing sale, so in effect Sales & Marketing committed Huffy to sales. However, in *John Maye Co., Inc. v. Nordson Corp.*, 959 F.2d 1402 (7th Cir.1992), the defendant never rejected an order from John Maye Co., but the terms of the contract made it clear that the defendant had discretion over whether to accept a sale. *See* 959 F.2d at 1406–08. This court held that, absent the defendant's explicit surrender of this right, the grantee did not have the power to sell within the meaning of the WFDL. *Id. See also Kornacki*, 956 F.2d at 132.

Huffy contends that it never had to reject a sale because Sales & Marketing made sales solely pursuant to the sales plan which was pre-approved by Huffy. Sales & Marketing had no leeway to deviate from this plan, so Huffy had no reason to object or reject any sales. Although Sales & Marketing had a credit line from Huffy and invoiced some customers, these facts are insufficient to indicate that Sales & Marketing had a right to sell when the contract explicitly gave Huffy the right to reject any sale.

Therefore, although we recognize that Sales & Marketing was not involved in an ordinary vendor-vendee relationship with Huffy, we conclude that the relationship between the two companies was more in the nature of a sales representative and was not the type of relationship that the WFDL was intended to protect, both because of a lack of community of interest between the two companies and because Sales & Marketing did

not have the authority to commit Huffy to a sale.

### B. *Breach of Contract*

Sales & Marketing's second claim against Huffy is breach of contract. As stated earlier, the contract at issue provided for immediate termination with cause or termination without cause upon 30 days written notice. While the letter of termination that Huffy sent to Sales & Marketing was worded as an immediate termination with cause, Huffy conceded at oral argument that there was an insufficient basis to terminate for cause. However, because the parties continued doing business for several months after Huffy sent the letter of termination, Huffy contends that the termination was properly carried out as a termination without cause.

Sales & Marketing argues that a material issue of fact exists because the relationship changed after the notice of termination and therefore the ensuing relationship could not accurately be considered an extension of the original contract. However, Sales & Marketing has failed to identify any way in which Huffy acted inconsistently with the contract after it sent the termination notice. Huffy continued to accept orders and ship products, just as it did before. Sales & Marketing claims that Huffy breached the original agreement when it contracted with Celtic to sell the same products the day after it sent the termination letter to Sales & Marketing. However, its contract did not contain any terms granting Sales & Marketing an exclusive right to any territory or to particular products. Furthermore, although Huffy did reach an agreement with Celtic almost immediately after it sent the termination letter to Sales & Marketing, the record reflects that Celtic did not submit any orders during the 30 days following the notice of termination of Sales & Marketing's contract.

While this contract may have contained terms particularly favorable to Huffy, Sales & Marketing entered into the agreement voluntarily and with full knowledge of the terms it contained. By agreeing to the liberal termination provision, Sales & Marketing left itself open to the potential for unexpected termination by Huffy, as happened here. Sales & Marketing does not maintain that the contract provisions were unlawful and we will not rewrite the contract even though it may arguably be unfair.

In conclusion, even though Huffy would have breached the agreement had it terminated its relationship with Sales & Marketing immediately as stated in its letter of termination, Huffy did not terminate the agreement but instead continued to accept and fill orders submitted by Sales & Marketing far beyond the 30 days that the contract required for termination without cause. We agree with the district court that because Huffy did not breach the contract, summary judgment in favor of Huffy was proper.

### CONCLUSION

For the foregoing reasons, as a matter of law, Sales & Marketing is not entitled to the protection of the WFDL and does not have a valid breach of contract claim. Therefore, the district court's grant of summary judgment in favor of Huffy is AFFIRMED.