**BEST GROUP, INC., Plaintiff,**

v.

**DRI–STEEM HUMIDIFIER CO., INC. and Trane Milwaukee, Defendants.**

No. 03–C–126.

United States District Court, E.D. Wisconsin.

March 28, 2003.

Daniel M. Janssen and Kevin M. Long, Quarles & Brady, Milwaukee, WI, Patrick D. Furman, Bachman Cummings McIntyre & Wilson SC, Appleton, WI, for Best Group Inc.

Kenneth B. Axe and Michael J. Lawton, Lathrop & Clark, Madison, WI, for Dri–Steem Humidifier Co. Inc.

Charles Graupner Paul Benson and Miriam Fleming, Michael Best & Friedrich, Milwaukee, WI, for Trane–Milwaukee.

## DECISION AND ORDER

GRIESBACH, District Judge.

This action arises under the Wisconsin Fair Dealership Law, Wis. Stats. §§ 135.01, et seq. (WFDL). Plaintiff Best Group, Inc., alleges that since 1985 it has been an exclusive dealer of Dri–Steem humidifiers in the state of Wisconsin. It claims that on October 1, 2002, defendant Dri–Steem Humidifier, Inc., violated the WFDL by terminating Best Group's dealership for the nine-county area in and around Milwaukee without providing Best Group the ninety-days notice required under the WFDL and an opportunity to cure any deficiencies.

On January 31, 2003, Best Group commenced this action in Circuit Court for Outagamie County and obtained a temporary restraining order. Soon thereafter, the case was removed to the federal court. The temporary restraining order was continued, with one exception that is not currently relevant, until a hearing and decision on plaintiff's motion for a preliminary injunction could be held. That hearing was held on March 19, 2003. Argument was presented orally and by brief, and evidence was submitted by affidavit and deposition testimony.

Upon consideration of the evidence presented and the arguments of counsel, I conclude that Best Group has failed to

demonstrate a reasonable likelihood of success on the merits. Accordingly, its motion for a preliminary injunction will be denied.

## I. Background

In 1985, Best Group was formed as a wholly owned subsidiary of R.E. Carlson, Inc., at the urging of Dale Rueckert, its current president and sole stockholder, for the purpose of selling Dri–Steem commercial and industrial grade humidifiers in Wisconsin. Best Group's initial relationship with Dri–Steem was governed by a "Manufacturer's Representative Contract." (Rueckert Aff. ¶ 10, Ex. A.)

Under the terms of the contract, Best Group was authorized to solicit orders within its territory for certain Dri–Steem products on the basis of terms and prices furnished by Dri–Steem. Under the original contract, Best Group's territory included the Upper Peninsula of Michigan and the State of Wisconsin except for certain counties in the west and southeast parts of the State. Upon Dri–Steem's acceptance the order, the contract provided that Best Group would be paid in one of two ways. If Best Group bought and resold the products, its compensation was the difference between its cost and selling price. If Dri–Steem invoiced the customer, Best Group's compensation was the difference between the selling price to the customer and the cost stated in the Dri–Steem price sheets or what was negotiated, less freight charges, taxes, commission splits and other agreed upon deductions.

Between 1985 and 1988, Best Group successfully introduced the Dri–Steem brand to engineers and contractors in the Wisconsin territory and increased its sales each year. In 1988, Best Group's territory was expanded to include the counties in southeast Wisconsin comprising the "Milwaukee Territory." By 1992, virtually all of the Dri–Steem products promoted by Best Group were purchased and owned by Best Group prior to resale. Neither at that time, however, nor at any time since, has Best Group actually taken possession of the Dri–Steem humidifiers it sold or maintained any inventory. Under the terms of the agreement, Best Group would submit orders to Dri–Steem on a buy and resell basis only. Dri–Steem could accept the orders, in whole or in part, or reject them. Best Group had no authority to assume or create any obligation on Dri–Steem's behalf. If the order was accepted, Dri–Steem would custom build the humidifier and ship it directly to the customer's building where it would be installed. Although Best Group bore the risk of non-payment by the customer on units it sold, the risk was in fact quite low. The products were usually sold to reputable contractors on commercial buildings on which liens could be obtained. And since it could purchase on credit from Dri–Steem, Best Group had time to collect from its customer, although often the payment from the customer was substantially slower than the payment Best Group was required to make to Dri–Steem.

Because it maintains no inventory, Best Group has no need of a showroom or warehouse. It subleases office space in a building located in Appleton which it shares, along with a part-time secretary, with another legal entity. In 1992, it hired Ron LaPlante who, along with Rueckert, comprise the entire sales staff. It has no specialized technical staff, trucks or delivery vehicles. Best Group does not install the equipment. Although it does some type of troubleshooting, start-up, warranty or other follow-up work on most projects, it does not have the facilities or expertise to involve itself in more complicated warranty work and repairs. It has no samples, demos, or specialized tools or equipment.

In June of 1999, Dri–Steem reduced Best Group's territory by transferring the counties in and around Madison to Trane–Madison. Although Rueckert thought that Dri–Steem's decision to reduce its territory violated Wisconsin law, he decided against filing suit after Dri–Steem's regional manager warned him that Dri–Steem would likely terminate the entire contract with Best Group if he did.

On February 7, 2001, the original contract was replaced by a new "Representative Agreement." Essentially, the new agreement continued the arrangement under which the parties had been working. However, it does identify Best Group as Dri–Steem's "exclusive distributer" authorized to distribute Dri–Steem products within its designated territory. It provides that Best Group has no right to use any of Dri–Steem's trademarks without Dri–Steem's written consent. It also explicitly requires Best Group to "use its best efforts to promote and sell DRI-STEEM Products and ... devote such manpower, time and attention reasonably necessary to fully develop the available market potential."

In June 2002, Steve Wagner, Dri–Steem's national sales manager, wrote to Best Group to express his concern about declining sales. (Wagner Aff., Ex. E.) He noted that sales in the recently reassigned southwestern Wisconsin territory were up, while sales in Best Group's remaining territory were down. *Id.* Several months later, by letter dated September 4, 2002, Wagner notified Rueckert that Milwaukee and eight surrounding counties were being eliminated from Best Group's territory effective October 1, 2002. This area, known as the Milwaukee territory, was then assigned to Trane–Milwaukee, leaving Best Group with only the counties located in northeast Wisconsin known as the Appleton territory.

Sales of Dri–Steem products constitute about 70% of Best Group's business, both in terms of revenue and gross profits. The same number also represents the percentage of time both Rueckert and LaPlante spend selling and promoting Dri–Steem products. In 2000 and 2001, Dri–Steem sales in the Milwaukee territory alone accounted for 42% and 32% of Best Groups gross profits, respectively. If it losés the Milwaukee territory, there is a significant chance the Best Group would not be able to remain in business. On the basis of these facts, it claims it is entitled to preliminary injunctive relief.

## II. Analysis

■ To obtain a preliminary injunction, Best Group must demonstrate a reasonable likelihood of success on the merits, irreparable harm, and no adequate remedy at law. *See AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803 (7th Cir.2002). If it demonstrates a reasonable likelihood of success, a court will then proceed to assess that likelihood (i.e., somewhat likely, very likely, etc.) and proceed to balance the harms in the case. *Id.* It must be remembered, however, that a preliminary injunction is a drastic remedy and is not freely given unless there is a clear showing of need. *See Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir.1999).

Here the initial focus must be on Best's reasonable likelihood of success (or lack thereof). The parties have substantially narrowed the dispute in this case to the central question of whether Best Group was a "dealership" within the meaning of the WFDL. If Best is in fact a dealership, the parties agree that the WFDL was violated by Dri–Steem.

The statute defines a dealership as:

A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by

which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). "Community of interest" is the vexatious phrase here, and is the only element of the definition that is at issue, as the parties do not dispute the existence of a contract or agreement between them by which Best Group was granted a right to sell or distribute Dri–Steem goods. (Dri–Steem Brief in Opp. at 11.)

"Community of interest" is defined by the statute as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1). The definition is so broad as to cover even business relationships that the parties concede, and the courts have held, are not intended to be covered, i.e. ordinary vendors and manufacturers' representatives. *See Ziegler Company, Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 604, 407 N.W.2d 873 (1987)("parties to a dealership must exhibit shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship"); and *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 26–28, 313 N.W.2d 60 (1981).

In construing this "vague and unhelpful" definition, *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992), the Wisconsin Supreme Court has declined to create a "bright line" rule that would provide clear guidance to businesses who risk running afoul of the WFDL and to the courts that must apply it. Instead, the Court has adopted a totality of the circumstances test that looks to

two "guideposts" which are assessed by considering ten or more "facets" of the relationship. In adopting such a test, the Wisconsin Supreme Court has deliberately chosen the flexibility that a multi-faceted determination made on a case-by-case basis allows over the predictability and certainty that a more specific test would provide. *Id.* at 606, 407 N.W.2d 873. Such flexibility permits a court to do what it perceives as just or equitable in the individual case before it. However, it also creates uncertainty and thereby leads to frequent litigation and the costs associated with it, as has occurred under the WFDL.

Be that as it may, I must apply the law of the state, as interpreted by the Wisconsin courts and informed by the analysis of other courts applying Wisconsin law. I therefore begin with the Wisconsin Supreme Court's decision in *Ziegler Co. v. Rexnord, Inc.* In *Ziegler,* the court discussed the meaning of the "community of interest" that must be present in any dealership relationship under Wis. Stat. § 135.02(3)(a). The *Ziegler* court reversed the court of appeals, finding that the lower court had improperly relied on only one aspect of the business relationship between the parties. *Id.,* 139 Wis.2d at 596, 407 N.W.2d 873. Instead, in determining whether a community of interest existed, the Wisconsin Supreme Court held that the court of appeals should have considered as "guideposts" whether the grantor and grantee of the alleged dealership had "a continuing financial interest in their business relationship" and their "interdependence, the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 604–05, 407 N.W.2d 873. In assessing these guideposts, the *Ziegler* court held, courts should look to "a wide variety of facets, individually and in their totality, as evidenced in the actual dealings of the parties and in their

contract or agreement." *Id.* The facets enumerated by the court include:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

139 Wis.2d at 606, 407 N.W.2d at 879–80.

These facets are nonexclusive and essentially create a "totality of the circumstances" test. Thus, the *Ziegler* court created a test with great flexibility, and it specifically rejected any kind of fixed percentage analysis because such an analysis "improperly truncates the court's inquiry into the relationship between the parties". *Ziegler,* 139 Wis.2d at 603, 407 N.W.2d at 878.

Notwithstanding the Wisconsin Supreme Court's rejection of "a bright line" or fixed percentage test, Best Group argues that the fact that approximately seventy percent of its gross profits is derived from its promotion and sale of Dri–Steem products

is determinative of the issue of whether it is a dealership. In support of this argument, it points to the Seventh Circuit's language in *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.,* 978 F.2d 395, 399 (7th Cir.1992), wherein the court attempted to further distill the principles underlying the Wisconsin cases addressing the concept of "a community of interest." In so doing, the *Frieburg* court stated:

> a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination . . . . . We also suppose that some combination of revenues and investments could manifest a community of interest, even if neither could standing alone.

(citations omitted). Best argues that it clearly qualifies under the first circumstance recognized by *Frieburg.*

*Frieburg,* however, did not purport to change the test for a dealership under the WFDL. In stating that a community of interest may be found to exist when one of the two circumstances is shown, it was not saying that the presence of either circumstance requires a finding that such a relationship exists. Instead, a more reasonable reading of its language is that, in the absence of either circumstance, no dealership can be found. Thus, as Dri–Steem points out, the court has frequently held that no community of interest exists in cases where the plaintiff was able to show even greater economic dependence on the alleged grantor than Best has shown here. *See Kania v. Airborne Freight Corp.,* 99 Wis.2d 746, 300 N.W.2d 63 (1981)(80–85%);

*Van Groll v. Land O'Lakes, Inc.*, 310 F.3d 566 (7th Cir.2002)(100% of sales); ·and *Rakowski Distributing, Inc. v. Marigold Foods*, 193 F.3d 504 (7th Cir.1999)(100% of profits); *Kornacki v. Norton Performance Plastics*, 956 F.2d 129 (7th Cir.1992) (75–80%).

These cases demonstrate that while economic dependence of the alleged dealer upon the alleged grantor is an important factor in determining whether a community of interest exists, more is required. Otherwise commissioned sales persons and manufacturer's representatives who sold only one product would all be covered under the WFDL. As Judge Reynolds noted in *Aida Engineering, Inc. v. Red Stag, Inc.*:

> The WFDL ... was not designed to protect every business relationship essential to the financial survival of one or more of the parties involved. The statute's protection is restricted to those businesses which have made a substantial capital investment in selling or offering for sale the products of the dealership grantor. Investments in inventory or real estate are protected because, as a general rule, they are made only in reliance on the continuation of the dealer-manufacturer relationship. Such investments often cannot be liquidated except on terms which are unfair to dealers and which sometimes unjustly enrich dealership grantors. Similarly, a heavy "front-end" dealer investment in advertising might qualify for WFDL protection because the dealer might otherwise be deprived of the return on that investment if the venture is successful.

629 F.Supp. 1121, 1126 (E.D.Wis.1986).

■ Indeed, if there is any clear rule that can been gleaned from the Seventh Circuit's pronouncements on the WFDL, it is that no dealership will be found in the absence of a tangible financial investment by the alleged dealer that is specific to the dealership that is claimed to exist, or what some courts have referred to as "sunk costs." *Frieburg*, 978 F.2d at 399. Thus, in *Sales & Marketing Assocs., Inc. v. Huffy Corp.*, 57 F.3d 602, 607 (7th Cir.1995), the court observed that "WFDL case law demonstrates that only a certain type of relationship is protected under it, and these cases all involve tangible financial investment." And in *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir.1989), the court noted in commenting on the statutory requirement of a community of interest, "[g]iven the rationale for the WFDL, ... the meaning of this requirement is apparent: it is where courts are to examine the relationship for indicia of a sufficient firm-specific investment." *See also Moore v. Tandy Corporation*, 819 F.2d 820, 822 (7th Cir.1987) ("To be a 'dealer,' you must have made a financial investment in the dealership.")

Nor can it be said that this requirement is simply an invention of the federal courts. In *Foerster, Inc. v. Atlas Metal Parts Company*, for example, the Wisconsin Supreme Court noted:

> The description of the businesses which the Fair Dealership Law was intended to cover indicates that the law was meant to protect only those small businessmen who make a substantial investment in inventory, physical facilities or "good will" as part of their association with the grantor of the dealership and is, thus, consistent with the common or accepted perceptions of the words franchise or dealership.

105 Wis.2d at 24, 313 N.W.2d 60.

And in *Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 507 N.W.2d 115 (Ct. App.1993), the Wisconsin Court of Appeals noted that what distinguishes a dealership from a typical vendor-vendee relationship

is "a substantial financial investment." The court observed:

> The typical vendee makes little or no investment except for inventory. If the relationship with its vendor is terminated, the vendee suffers only a loss of future profits unless its inventory is unsalable.

179 Wis.2d at 210–11, 507 N.W.2d 115.

■ It is as to this requirement that Best's claim to dealership status fails. As noted above, Best Group operates out of a rented office. It has no inventory, no warehouse, no showroom, no service technicians, no specialized equipment or other property or personnel in which it made substantial investments specific to the Dri–Steem line of products. Although Rueckert paid a total of $50,000 to Carlson for Best's stock between 1986 and 1993, Best never paid Dri–Steem any fee for the right to sell its products. And its overall advertising expenses were minimal. Like the plaintiff in *Guderjohn,* what it stands to lose upon termination of the contract is not a substantial financial investment, but future profits. This is not enough. *Sales & Marketing,* 57 F.3d at 607 ("Because Sales & Marketing has failed to establish any tangible financial loss other than lost profits arising from the termination of its agreement with Huffy, we conclude that the requisite community of interest was not present in this case.")

Consideration of the other *Ziegler* factors does not change the result. Thus, the fact that Best group has been selling and promoting Dri–Steem products for more than seventeen years does not create a community of interest. In *Kornacki,* the plaintiff had been developing customers for the alleged grantor and its predecessor for thirty-three years. Despite this fact, the court rejected his claim of dealership status. "This kind of good will ... is not enough to make Kornacki a dealer under the WFDL." 956 F.2d at 133.

The contract under which the parties operated also fails to support a finding of a dealership. Until 2001, Best Group was working under a "Manufacturer's Representative Contract," which imposed virtually no obligations on Best other than it not sell competitive products without Dri–Steem's consent. Although the 2001 agreement required Best to "use its best efforts to promote and sell Dri–Steem Products and ... devote such manpower, time and attention reasonably necessary to fully develop the available market potential," this is no different than the obligation any manufacturer's representative or sales person would have. There was no requirement that Best make any significant investment in plant, facility, tools or inventory that would put it at risk, and as the evidence shows, Best did not do so.

While both of Best Group's full-time employees devoted most of their time to promoting and selling Dri–Steem products, this fact too is more reflective of the fact that Dri–Steem was essentially the only manufacturer they represented than the existence of a dealership. One would similarly expect a door-to-door salesman for a single manufacturer to devote all or almost all of his time to the sale of that manufacturer's products. But that would not make him a dealer. There is no showing here that Best invested in specialized training for either employee or purchased special tools for them so that it could fulfill its obligations under the contract.

It is true that Best Group was granted an extensive and exclusive territory. At one time, its territory included most of the State of Wisconsin. But again, such a grant can be reflective of business relationships other than dealerships. *See Kornacki* and *Van Groll, supra,* and *Beloit Beverage Co. v. Winterbrook Corp.,* 900 F.Supp. 1097 (E.D.Wis.1995). And while Best Group did use Dri–Steem's trade

name on its uniforms, business cards and assorted promotional items, its use was not so extensive as to warrant a finding that it was a dealer. For example, there is no evidence of any expenditures for signs, trucks or other equipment bearing Dri–Steem markings or logos. In fact, the most recent agreement between the parties expressly prohibited Best from using Dri–Steem's "trademarks, service marks, designs, markings, logos or trade names" without Dri–Steem's written consent, which consent was never given.

Finally, although Best Group does do some trouble shooting and simple follow-up on most of its sales, it has neither the personnel nor expertise to do significant warranty work. Again, it has not made the kind of investment in the business that would be needed to make such service possible.

In sum, I conclude from the evidence before me that Best Group is probably not covered by the WFDL. Essentially, Best Group operates as a manufacturer's representative for Dri–Steem. Although it is true that since 1992, Best has taken title to the units it sells, its taking of title is more form than substance. Best does not have a ready inventory of Dri–Steem humidifiers that it offers for sale on demand. It solicits orders and then submits them to Dri–Steem. Best has no authority to bind Dri–Steem to a sale, but can only complete the sale if Dri–Steem accepts the order. All orders are on a "buy and resell basis only." If Dri–Steem does accept the order, it custom manufactures the humidifier and ships the unit directly to the customer's installation site. Thus, Best never takes possession of the unit, and as noted above, its risk of nonpayment was low. This, I conclude, is not the kind of relationship the WFDL was intended to protect.

Accordingly, for these reasons, I find that Best Group has failed to demonstrate a reasonable likelihood of success. I therefore conclude that its motion for a preliminary injunction should be denied and the temporary restraining order previously entered should be dissolved.

**IT IS THEREFORE ORDERED** that the plaintiff's motion for a preliminary injunction is hereby **DENIED** and the temporary restraining order previously entered is dissolved;

**IT IS FURTHER ORDERED** that the parties appear telephonically by counsel at 9:30 A.M. on April 17, 2003. Prior to the scheduled conference counsel shall provide the clerk with the telephone number where they can be reached. The court will initiate the call.