**SUPER NATURAL DISTRIBUTORS, INC., Plaintiff,**

v.

**MUSCLETECH RESEARCH AND DEVELOPMENT, Defendant.**

No. 00–C–1361.

United States District Court, E.D. Wisconsin.

March 12, 2002.

Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Plaintiff.

Kathleen S. Donius, Reinhart, Boerner Van Deuren, Milwaukee, WI, Howard J. Shire, Joseph F. Nicholson, Gregg A. Paradise, of Kenyon & Kenyon, New York City, for Defendant.

## ORDER

STADTMUELLER, Chief Judge.

Defendant MuscleTech Research and Development ["MuscleTech"] is a Canadian manufacturer of a popular line of dietary supplements. Plaintiff Super Natural Distributors, Inc. ["Super Natural"] is a national distributor of health products, including those of MuscleTech, whose physical plant is located in Waukesha, Wisconsin. This case arises out of MuscleTech's termination of Super Natural's distributorship after learning that Super Natural had obtained nearly $1 million worth of possibly counterfeit MuscleTech product from a mysterious off-shore supplier recommended by a former MuscleTech employee currently under indictment for fraud. Super Natural claims that the termination was improper under the Wisconsin Fair Dealership Law ["WFDL"] because the termination notice did not set out all the reasons for termination and did not offer a realistic opportunity to cure. Super Natural also alleges that MuscleTech violated the Robinson–Patman Act, 15 U.S.C. §§ 13(a) *et seq.*, by engaging in price discrimination injurious to interstate commerce.

As the injuries complained of exceed $75,000 and the parties are of diverse citizenship, jurisdiction in this court is proper pursuant to 28 U.S.C. §§ 1332, 1441. Jurisdiction is also proper under 28 U.S.C. §§ 1331, 1337 due to the presence of a federal claim. Venue is proper pursuant to 28 U.S.C. § 1441(a) because the claims arose in this district.

In its defense, MuscleTech contends that the MuscleTech—Super Natural relationship was not a "dealership" and that Super Natural is not entitled to the protections of the WFDL.[1] It further argues that if the relationship was in fact a dealership within the meaning of the WFDL, it was not a "Wisconsin" dealership protected by that law. MuscleTech is currently before the court seeking summary judgment on the WFDL claim. The parties agree that a trial is necessary on the Robinson–Patman Act claim.

## BACKGROUND

Super Natural is a large operation. In 2000, its sixteenth year of existence, Super Natural sold nearly $23 million worth of merchandise to 1400 different retailers nationwide,[2] earning gross profits of over $3.7 million.[3] Although Super Natural distributes the products of more than 200 vendors, it generated 19.25% of its revenue[4] in 2000 from sales of MuscleTech-branded goods. This was a sharp increase over the previous year, when MuscleTech accounted for only 8.7% of Super Natural's sales. In the other two years of the noncontractual MuscleTech–Super Natural relationship, the shares of revenue derived from MuscleTech goods were 6.42% (1998) and 0.85% (1997). Super Natural attrib-

utes the annual increases, especially the increase from 1999 to 2000, to its increased investments and sales efforts dedicated to the MuscleTech brand. MuscleTech attributes the gains to its own increased advertising, to its expansion of the product line, to a more than 50% decrease in the number of authorized MuscleTech distributors, and, most significantly, to Super Natural obtaining unauthorized, possibly counterfeited, products, which it could sell at below-market prices. MuscleTech points out that "MuscleTech" product obtained from MuscleTech Research and Development itself only accounted for 12.5% of Super Natural's revenues in 2000 and 7.63% in 1999. The other 6.75% and 1.07%, respectively, came from an unauthorized supplier named "M Olympus" (discussed below).

In support of her position that Super Natural's efforts led to most of the sales increases, Super Natural president Patricia Calvy notes that in September 2000, Super Natural signed a fourteen-month lease on a larger warehouse than it had previously occupied. This warehouse costs $21,000 a month in rent, as opposed to the $9,000 per month it had previously paid. Ms. Calvy says MuscleTech pressured her into leasing this larger space by instituting a $100,000 per month order minimum (raised to $200,000 in April 2000)[5] for dis-

1. MuscleTech also argues that it had good cause to terminate Super Natural even if the WFDL were to apply to the relationship. As "good cause" is a fact-bound concept, however, MuscleTech has chosen not to pursue this argument on summary judgment. MuscleTech has sued Super Natural in the federal district court for the Western District of New York for Super Natural's alleged participation in a counterfeiting conspiracy.

2. Although Super Natural is physically located in Wisconsin, less than 1% of its sales occur here and none of its five largest customers are located here. Super Natural has provided no evidence that it has dedicated any

resources specifically to developing the Wisconsin market for nutritional products.

3. Net profits were $922,503.

4. While Super Natural generated 19.25% of its revenue from MuscleTech-branded products in 2000, only 15.83% of its profits were derived from the line.

5. It may be appropriate to note that Super Natural ordered more than $200,000 worth of merchandise from MuscleTech each month even before the per month minimum was increased and well before moving into the new space.

tributors wishing to receive the company's largest discounts. MuscleTech disputes that *it* forced Super Natural to increase capacity, noting that Super Natural's overall sales increased more than 100% between 1997 and 1999 and that only 1/28th of the new warehouse's floor space was actually dedicated to MuscleTech product before the relationship was finally severed in February 2001.[6] MuscleTech suggests that increased demand for bulky products from two other manufacturers played an as large, if not larger, role in the decision to move. Both parties agree, however, that Super Natural's sales of MuscleTech goods likely would have grown in the future had the relationship not come to an end. Super Natural originally hired eight additional employees to work in the new warehouse, though seven have since been released.

Super Natural undertook one other relatively significant investment in 2000, spending $40,000 to purchase a permanent mobile trade show booth to bring to the five annual trade shows it has attended for at least the last half-decade.[7] Ms. Calvy states in an affidavit that Super Natural would not have undertaken this expense had it known that its ties to MuscleTech would soon be severed (though pictures supplied to the court show that Muscle-Tech was but one of over a dozen manufacturers promoted in the booth). Ms. Calvy asserts that Super Natural gave "priority" to MuscleTech's products during trade shows, but she has not explained how she did so and the pictures supplied to the court do not suggest any MuscleTech emphasis. She states that she intends to cut back on the number of shows Super Natural attends now that the company no longer represents MuscleTech or Cytodyne (a health products company that accounted for 9% of Super Natural's sales in 2000).

The relationship between Super Natural and MuscleTech began to unravel in the summer of 2000. On June 29 of that year MuscleTech informed Ms. Calvy that Kent Mosur, a MuscleTech employee she had done business with, had been fired for suspected participation in an operation counterfeiting MuscleTech products. Mr. Mosur had been Super Natural's regular contact at MuscleTech until January 2000. At that time, he was promoted from assistant wholesale manager to international sales manager. In late 1999, before Mr. Mosur's promotion, Ms. Calvy contacted Mr. Mosur to complain that another distributor, Costello's, was receiving lower prices than she. Mr. Mosur reportedly suggested that she could obtain lower-than-wholesale prices by purchasing from a Spanish distributor named M Olympus. She claims she believed M Olympus to be an authorized MuscleTech distributor who could offer unusually low prices because MuscleTech had a different pricing scheme for Europe than it did for America. While she felt uncomfortable about buying on the

---

6. This 1/28th number was advanced by MuscleTech executive vice president Terry Begley during the course of a preliminary injunction hearing held in this court on January 17, 2001. When the court asked Ms. Calvy what percentage of floor space was dedicated to MuscleTech products, she responded that she did not know. In papers responsive to the defendant's current motion Super Natural suggests that the 1/28th number was artificially low because the distributor was having difficulties obtaining all the MuscleTech product it desired at the time the warehouse was inspected. Super Natural has not provided the court with a number it believes would be more representative of a "typical" day in the Super Natural–MuscleTech relationship, however.

7. Super Natural has attended trade shows for ten years, though the court has not been made aware of the exact number of shows attended by the company prior to the initiation of the Super Natural–MuscleTech relationship.

grey market, nothing in her informal agreement [8] with MuscleTech prevented her from doing so, and she did, in fact, buy substantial quantities of goods from the purportedly Spanish outfit. She did not undertake any investigation to determine M Olympus's identity nor did she ever speak with an M Olympus representative; her orders were placed via e-mail.

MuscleTech has since uncovered evidence that M Olympus was not an authorized distributor, but rather a thinly-disguised front for Mr. Mosur himself, who was selling counterfeit goods manufactured in Florida and shipped from warehouses in New York. While MuscleTech has yet to produce any physical evidence that the "MuscleTech" goods Super Natural obtained from M Olympus were counterfeit,[9] Ms. Calvy admits that some other goods supplied by M Olympus—purported "Cytodyne" products—were, indeed, fake.[10]

In any case, on September 18, 2000, MuscleTech informed Ms. Calvy that the FBI was investigating the counterfeiting of MuscleTech merchandise. The company asked for Ms. Calvy's records related to her dealings with M Olympus (which only recently had come to light). She provided numerous documents to the company. In spite of her apparent cooperation, on October 2, 2000, an expected delivery of MuscleTech product to Super Natural failed to arrive. Ms. Calvy was told that the delay was due to a credit limit problem. Shortly thereafter, Ms. Calvy wired MuscleTech $147,000 to cover a separate invoice that was not yet due. The merchandise still did not arrive, despite the fact Super Natural was well below its credit limit. On October 12, 2000, MuscleTech informed Ms. Calvy that it would not be shipping the order because it suspected Super Natural of collaborating with Mr. Mosur in making and distributing counterfeit MuscleTech products. She was told that all further shipments would be suspended pending investigation. The very next day, Super Natural instituted this lawsuit in Waukesha County (Wisconsin) Circuit Court in an effort to ensure future deliveries of MuscleTech products.

MuscleTech immediately removed to this court. The companies then agreed temporarily to resume shipments, subject to MuscleTech's intent to send a written termination notice. On October 25, 2000, the anticipated termination notice arrived. It indicated termination would occur in sixty days [11] and was based on 1) Super Natural's alleged participation in a counterfeiting ring, 2) Super Natural's failure to follow MuscleTech's directives, 3) misrepresentations about Super Natural's purchase of "counterfeit" products, 4) Super Natural's "poor payment history," and 5) Super Natural's withholding of informa-

**8.** The two parties never had a written contract.

**9.** Investigations suggest that in addition to counterfeiting MuscleTech goods, Mr. Mosur stole genuine MuscleTech merchandise and sent it to purchasers who were unhappy with the quality of the counterfeit product. It is possible that Super Natural (knowingly or—as Super Natural ardently contends—unknowingly) received stolen goods in place of, or in addition to, counterfeit goods.

**10.** As a consequence of Super Natural's purchase of counterfeit Cytodyne products that

company terminated its relationship with Super Natural effective April 6, 2001.

**11.** MuscleTech later agreed to stay termination until this court ruled on Super Natural's motion for a preliminary injunction. The court denied Super Natural's motion on February 6, 2001, *see Super Natural Distrib. v. Muscletech Research & Dev.,* 131 F.Supp.2d 1058 (E.D.Wis.2001); it is presumed that shipments stopped shortly thereafter (the parties say only that shipments ended in "February").

tion related to its purchase of goods from M Olympus. The only opportunity to cure offered was that if Super Natural could "restore MuscleTech's trust" in sixty days, termination would be rescinded. Super Natural vehemently denies that it ever sold counterfeited MuscleTech products, misrepresented facts to MuscleTech, regularly fell behind in its payments, or did anything else to warrant termination. It further asserts that the opportunity to cure offered was chimerical.

In 1996, when the Super Natural–MuscleTech relationship began, both companies were significantly smaller than they are today. MuscleTech in particular was a fledgling company with no established United States distribution network. In that year MuscleTech entered agreements with at least six distributors—including Super Natural, which had retail contacts throughout the United States. MuscleTech was a relatively unimportant supplier for Super Natural in the early days of the relationship and MuscleTech imposed no requirements on Super Natural in exchange for the right to sell the manufacturer's goods. Super Natural paid no franchise fees to MuscleTech, was given no sales requirements, and was not asked to undertake any promotional activities on behalf of the brand. Neither Super Natu-

ral nor any other distributor was given an exclusive sales territory. Sales were low.

In a very short time MuscleTech became a much more popular line—both for Super Natural and all the other distributors. Prior to April 2000, MuscleTech did not impose any additional requirements on Super Natural for the right to continue as a distributor, however. The only way in which the relationship changed was that MuscleTech asked Super Natural (and all other distributors) to meet certain increasing sales targets if it wished to obtain the largest volume discounts offered by the manufacturer. With isolated exceptions, Super Natural always met the sales targets—even before obtaining additional warehouse space. MuscleTech did not penalize Super Natural on the handful of occasions it missed its sales target; the distributor was still given the largest volume discount available.

Certain distributors that regularly missed their sales targets were removed from MuscleTech's distribution network, however. MuscleTech notes that these companies had other problems, as well (particularly poor payment histories), and that several have addressed MuscleTech's concerns and have been reinstated as distributors even though they seldom meet their sales targets.[12]

---

**12.** An internal MuscleTech document provided to the court lists eleven terminated distributors, each annotated "did not meet DIP." "DIP" was the distributor incentive program by which volume discounts were granted to distributors who sold larger quantities. MuscleTech's executive vice president states (perhaps in contradiction to the document) that the distributors were not terminated for failing to meet the DIP, however, and that several have since been reinstated. He states that Elite Athlete has been reinstated despite continuing to miss monthly DIP minimums; Heavy Metal Barbell was terminated because it is a retail store that misrepresented itself as a distributor; Sportika Domestic was terminated because it went out of business (though a related entity, Sportika Export is still a

MuscleTech distributor); Stow Mills was terminated at the distributor's request; United Natural Foods has been reinstated as a distributor; Natural Resources was reclassified as a retail customer; Power Shack was terminated for poor payment history; E & J Distributing merged with another company that is a current customer of MuscleTech; D & J placed no further orders after credit was not extended; and Kaizen was terminated because it is not only a distributor, but also a manufacturer who makes directly competing products. During the course of his deposition, MuscleTech's national sales manager stated that one other distributor—Palko's—was terminated for poor payment history and for failure to meet the buying requirement—issues that he said "went hand-in-hand."

In April 2000 MuscleTech invited Ms. Calvy to its headquarters for a meeting. At that meeting a MuscleTech representative indicated that the manufacturer might be shrinking its distribution network and that if Super Natural wished to continue it should do two things—continue to carry the full MuscleTech line of products (something Super Natural had done since the beginning of the relationship), and give "priority status" to the MuscleTech brand. MuscleTech did not indicate what it meant by "priority status," however. No specific requirements were imposed,[13] and Super Natural was not asked to discontinue sales of any of MuscleTech's competitors' products (Twin Labs and Cytodyne, two of MuscleTech's largest competitors, constituted large portions of Super Natural's sales; 13% and 9%, respectively, in 2000).

With one exception, MuscleTech and Super Natural did not at any point enter into any cooperative advertising agreements. Super Natural offered advertising space in the quarterly catalogues it sent to retail stores, for example, but MuscleTech never purchased any. Four times during the course of the roughly four year Super Natural–MuscleTech relationship Super Natural of its own accord pictured a MuscleTech product on its catalogue cover [14] (though alongside at least a dozen products from competing manufacturers). One issue of the catalogue contained a MuscleTech ad that had been produced and placed by Super Natural itself.[15] Super Natural also forwarded posters and other promotional materials from MuscleTech to the retail stores at Super Natural's expense, though there is no evidence that MuscleTech asked it to do so, whether the materials were sent specially or simply packed with the product itself, or what expense Super Natural undertook in forwarding the materials.

MuscleTech did not ask or require Super Natural to attend trade shows. Several MuscleTech distributors never attend trade shows at all. MuscleTech, however, offers "show special" discounts to distributors who do attend major trade shows. Further, MuscleTech wrote a letter to one major distributor criticizing it for failing to attend a large show in Baltimore. It was MuscleTech's position that attendance would be beneficial to both the distributor and the manufacturer as a way to show support of their retail outlets and to educate them about new products. MuscleTech did not ask Super Natural to purchase a permanent trade show booth and was not made aware of the purchase until after it occurred.

Super Natural's sales representatives handle specific stores, not specific lines. That is to say, each sales representative builds relationships with individual retail stores and presents Super Natural's entire line of over 9000 products from 200+ manufacturers to each of those stores. Ms. Calvy states that each representative received specialized training from MuscleTech, but has not informed the court what

---

13. A couple months earlier MuscleTech had specifically asked Ms. Calvy not to sell any goods to three distributors who recently had been removed from the manufacturer's distribution network for undertaking actions contrary to MuscleTech's interests, however. Ms. Calvy complied with the request not to sell to the three distributors, though Super Natural had sold MuscleTech goods to a different sub-distributor in the past. MuscleTech was aware of Super Natural's earlier sub-distributor sales and had not objected.

14. Super Natural notes that prior to November 1998, it did not place product pictures on its company's catalogue covers. MuscleTech products were depicted on four of the six Super Natural catalogue covers produced between the winter of 1998 and the spring of 2000.

15. Super Natural has not informed the court of the expense it undertook in producing this ad or the retail value of the ad space.

that training involved, how many hours of training were received, or any other further details. She estimates that over the course of the relationship her employees spent several thousand hours representing the MuscleTech brand but, again, she provides no details regarding what that representation might have entailed.

The one cooperative promotional activity undertaken by Super Natural and Muscle-Tech involved a retail display contest. On two occasions Super Natural worked with MuscleTech to administer contests in which retailers could vie for product prizes, provided by MuscleTech, by creating outstanding in-store displays of MuscleTech products and sending pictures of those displays to Super Natural for evaluation. Ms. Calvy has not informed the court how much time or expense went into these contests, though she does say Super Natural did not undertake any comparable promotional effort for any other supplier.

Super Natural contends that although it never had any formal promotional agreement with MuscleTech, its promotional efforts on behalf of the brand were actually perfectly complementary to MuscleTech's own efforts: MuscleTech tried to build consumer demand by advertising in specialty magazines read by fitness enthusiasts, while Super Natural sought to motivate retailers to meet that demand by representing the line at trade shows and in its catalogues directed to retail establishments. MuscleTech did do its own retailer-based marketing, however, instituting a telemarketing campaign in 1998 to target retail outlets across the country.

Although never disclosed to its distributors, in late 1999 MuscleTech developed a business plan designed to foster stronger relationships between the manufacturer and its distributors. The apparent start-ing point for this plan was MuscleTech's dissatisfaction with Costello's, a high volume distributor that had functioned as "nothing more than an order taker for MuscleTech products." The plan called for an increase in the purchase level requirement for the greatest discounts. The company's internal documents predicted that this increase would encourage distributors to purchase more product and, as a consequence, increase their own promotional activities in an effort to move the product. It was envisioned that distributors might need to warehouse more inventory as a result of the increased volume predicted to be purchased. Additional incentives were considered to induce the distributors to maintain such inventory, such as a 2% rebate. The distributors were not told the reason for the volume increase and no evidence has been produced addressing whether the increase did result in increased promotional efforts on behalf of any distributor or whether any distributor did experience greater warehouse space pressures.

The events described above have not been painless for Super Natural. At least partly as a result of losing the MuscleTech and Cytodyne distributorships, Super Natural's sales were down 25% through the first four months of 2001 as compared to the same period in 2000. Although Super Natural turned a gross profit of $748,000 in the first quarter of 2000, the distributor's accountant contends that if one looks not to the gross figures, but rather to the net figures, and not to January through March 2001, but rather to February through April 2001, Super Natural actually experienced a loss of nearly $275,000. This loss was exacerbated by over $100,000 in legal fees [16] paid by the distributor during the first quarter of 2001 to prosecute

16. Since Ms. Calvy's accountant specifically used the phrase "net operating loss," it is clear operating expenses such as legal fees were included in the figure.

and defend lawsuits in three separate federal district courts related to the alleged counterfeiting of MuscleTech and Cytodyne products.

Although Super Natural added more than 800 new items to its product line in early 2001 in an attempt to offset the loss of two of its largest suppliers, by June 1, 2001, Super Natural had not yet seen a positive impact in the bottom line. Ms. Calvy has expressed fear that losses may continue so long she will be required to close up shop. In her words: "Having won an established place for MuscleTech on the shelves of ... retailers' stores, we cannot now simply tell the retailers to stop buying MuscleTech and buy more of some other line that we happen to carry." In an effort to reduce short-term costs she has laid off seven employees and has announced plans to withdraw Super Natural's attendance from two of the five trade shows it regularly attends (saving over $20,000 in registration fees and travel expenses).

## DISCUSSION

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of asserting the absence of any dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

Even if some facts are in dispute, entry of summary judgment is appropriate if the movant either establishes uncontroverted facts entitling it to summary judgment or demonstrates that the nonmoving party

has failed to make a sufficient showing on an essential element of its case with respect to which it will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. The court is to draw all reasonable inferences from the record in favor of the non-moving party, *see Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.*, 40 F.3d 146, 150 (7th Cir. 1994), but need not give credence to conclusory allegations or self-serving affidavits, *see Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir.1998).

The Wisconsin Fair Dealership Law—the statute at issue here—provides among other things that a grantor of a Wisconsin dealership may not fail to renew a dealership agreement without good cause. *See* Wis. Stats. § 135.03. The primary issue before the court is whether the Muscle-Tech–Super Natural relationship was a "dealership" protected by the WFDL at all. If not, Super Natural can raise no legal complaint to its termination as a MuscleTech distributor. *See Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992)(business relationships other than dealerships not protected by the WFDL).

> Under the WFDL, "dealership" means: a contract or agreement, either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stats. § 135.02(3). The most "vexing" component of this definition is the phrase "community of interest." *The Bal-*

dewein Co. v. Tri–Clover, Inc., 233 Wis.2d 57, 66, 606 N.W.2d 145 (Wis.2000). The other two elements of a dealership—(1) an agreement (2) by which a person is granted the right to distribute goods or services—are not in dispute in the present case.

■ If the facts are undisputed, whether the community of interest requirement has been met is a question of law. See Guderjohn v. Loewen–America, Inc., 179 Wis.2d 201, 205, 507 N.W.2d 115 (Wis.App. 1993). A judge—and not a jury—has resolved this question in every case of which the authors of the leading treatise on the WFDL (including the plaintiff's attorney) are aware. See Michael A. Bowen & Brian E. Butler, The Wisconsin Fair Dealership Law, § 4.4 at 4–8 (2nd ed.2001). It has been suggested, however, that if the facts (or the reasonable inferences to be drawn therefrom) are in dispute a jury might be called upon to find the facts, at which time the judge would resolve the ultimate issue of whether a community of interest—and, by extension, a dealership—existed based on the facts found by the jury. See id. It is therefore the court's present duty to determine if, as MuscleTech contends, no community of interest existed between Super Natural and MuscleTech even taking the facts in the light most favorable to the plaintiff. If it cannot, a trial will be required before the court may resolve the issue.

■ The Wisconsin Supreme Court has established a totality of the circumstances test to determine if a community of interest is present in a given commercial relationship. See Sales & Marketing Associates, Inc. v. Huffy Corp., 57 F.3d 602, 605 (7th Cir.1995)(citing Ziegler Co. v. Rexnord, Inc., 139 Wis.2d 593, 605–606, 407 N.W.2d 873 (Wis.1987)). A community of interest exists if the alleged grantor and putative dealer share a "continuing financial interest" in their business relationship

and are "interdependen[t]" on each other. Ziegler, 139 Wis.2d at 604–605, 407 N.W.2d 873. A dealer can manifest a continuing financial interest in the relationship by, among other things, investing in grantor-specific inventory and facilities. See id. at 607–608, 407 N.W.2d 873. Interdependence means the establishment of shared goals and cooperative effort "more significant than in the typical vendor-vendee relationship." Id. at 604, 407 N.W.2d 873. These guideposts require a plaintiff "to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to [its] economic health[.]" Id. at 605, 407 N.W.2d 873.

Realizing that continuing financial interest and interdependence are somewhat nebulous concepts, the Wisconsin Supreme Court has identified ten "facets" to the guideposts that should be considered when determining if a community of interest has, indeed, been demonstrated: 1) how long the parties have dealt with each other; 2) the extent and nature of the obligations imposed on the parties in the contract or agreement between them; 3) what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; 4) what percentage of the gross proceeds or profits the alleged dealer derives from the alleged grantor's products or services; 5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer; 6) the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); 7) the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; 8) the personnel which the alleged dealer devotes to the alleged dealership; 9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; and

10) the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. *See id.* at 606, 407 N.W.2d 873. The court has warned that none of the facets is dispositive, nor is the list exclusive. The Seventh Circuit Court of Appeals has suggested that it may be more useful to focus one's attentions on whether (1) the revocation of the dealership would pose a threat to the company's economic health (read by many courts to mean "economic viability," *see, e.g., C.L. Thompson Co. v. Festo Corp.,* 708 F.Supp. 221, 226 (E.D.Wis.1989)), or (2) the revocation would result in a loss of considerable "sunk costs." *See Frieburg,* 978 F.2d at 399.

■ Throughout a court's analysis, it is important to keep in mind that the purpose of the WFDL is to prevent exploitation—to prevent "suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 419 (7th Cir.1990). Where there is "no opportunity to exploit," there is no community of interest. *Id.*

■ Looking to the first indicator suggested by the Seventh Circuit, it appears that in at least the short run Super Natural's sales will decrease by up to 12 to 13% as a result of MuscleTech's termination of the distributor. This observation is supported by the fact MuscleTech merchandise provided to Super Natural by the manufacturer accounted for 12.5% of Super Natural's sales in 2000—a number that might be lower than it would have been if MuscleTech had not temporarily suspended shipments for several weeks in October. It also is supported by the fact Super Natural's sales did decrease by 25% in the first four months of 2001 as compared to 2000 and the company sold no goods from

M Olympus during that period (as opposed to roughly 6.75% of sales in 2000), MuscleTech terminated its distributorship in early February of that year, and Cytodyne (which had accounted for 9% of Super Natural's 2000 sales) sent it a notice of termination on March 6, 2001, with a final cut-off date of April 6.

Super Natural argues that expected sales decreases of 20%—not 12 to 13%—should be attributed to MuscleTech. No evidence in the record supports this position, however. At no time in Super Natural's history did merchandise from MuscleTech account for more than 12.5% of Super Natural's sales. In fact, goods from the company accounted for only 7.63%, 6.42% and 0.85% of Super Natural's sales in the years prior to 2000. While the parties may have expected the percent to increase in future years, sales *decreases* cannot in any way be attributed to expected increases that did not materialize. *Cf. C.L. Thompson,* 708 F.Supp. at 226 ("the Court's interest is in [plaintiff's] present dependence on [the] distributorship rather than any possible dependence five years from now"). Also, Super Natural may not attribute its M Olympus purchases to MuscleTech. As Super Natural itself admits (indeed, it is the entire basis of its argument that it did nothing wrong by purchasing from M Olympus), distributors are not required to purchase MuscleTech goods from MuscleTech itself; they may also purchase from wholesale distributors—or anyone else for that matter. Any indirect purchases Super Natural may have made in the past (and may choose to make in the future) are not affected by MuscleTech's decision no longer to sell directly to Super Natural.

Presuming Super Natural's sales do decrease by 13% as a result of the discontinuation of the Super Natural–MuscleTech relationship, the court must examine

whether this decrease will imperil the financial health of the company. Super Natural argues that it will—pointing to the fact the company suffered a net loss of nearly $275,000 between February and April of 2001, at least some of which is directly attributable to the MuscleTech severance (other portions must be attributed to the Cytodyne severance and Super Natural's unusually large legal fees). The argument is well-taken: companies cannot incur losses forever and survive.

It is unclear how much weight to give the plaintiff's argument, however. Even were the court to attribute $150,000 in net losses during the months of February to April 2001, to MuscleTech, those losses pale in comparison to the over $900,000 in net *profits* made during 2000. It is clear that Super Natural can absorb such losses for at least a moderate period of time before becoming unviable as an entity. Further, there is absolutely no evidence (Ms. Calvy's fear is not evidence) that the losses will continue long enough to jeopardize the sustainability of the operation.[17] Super Natural has added 800 products to its product line since losing the direct MuscleTech account and has acted swiftly to cut costs. While the parties have not informed the court if Super Natural chose to discontinue its $21,000 per month lease when it came up for renewal this past fall, the distributor could have saved additional money by doing so.

Finding little (but not no) evidence of a threat to Super Natural's economic health, the court turns its attention to the second issue suggested by the Seventh Circuit: sunk costs. Perhaps in the totality of the circumstances doing so will clarify whether a community of interest exists between Super Natural and MuscleTech.

Super Natural claims it made at least three "grantor-specific" investments in the Super Natural–MuscleTech relationship that it cannot now recover. First, it claims that it leased a larger warehouse specifically to service MuscleTech's retail customers. The court is not at all convinced of this assertion. Super Natural's sales as a whole had increased 100% from 1997 to 1999—presumably necessitating more space—and MuscleTech products occupied only 1/28th of the floor space in the warehouse. Further, when she was asked at her deposition Ms. Calvy attributed only part of the need for a new warehouse to MuscleTech, stating that she entered the new lease due to "Growth. Because of growth. . . . MuscleTech is, obviously, a big part of it [but] we also were carrying Worldwide Drinks. Those take up a lot of space. . . . [Also,] Next Nutrition has been a big part of it, because some companies keep introducing new products that are really big. . . . We didn't really pick up any new lines, too many new lines, anything large that would take up a lot of space. We didn't take on any of those until we moved, and now we're starting to take on some of those like Human Development Technology. Our customers have asked us to carry that product line." When asked if

---

**17.** Ms. Calvy tries to make an issue on this point by noting that historically Super Natural's sales lag in October, November, and December. In fact, in December 2000 the company suffered a small net operating loss even though its access to MuscleTech and Cytodyne products had not yet been blocked. Although not stated as such, it might be reasonable to infer that what was a small (roughly $20,000) loss in December 2000 might have become a much larger loss in December 2001. Even assuming that to be the case, there is no evidence that the losses (if they occurred) would actually threaten the health of what has been, to date, an amazingly profitable business. No statistical model, or even professional opinion, has been presented suggesting what the impact of MuscleTech's loss might be. As the court has not been informed otherwise, it presumes Super Natural is still in business despite having lost the MuscleTech account more than a year ago.

she would have taken on the additional product lines without the new warehouse, she said, "no."

Nonetheless, there is some evidence that the new lease would not have been entered into without an expectation that Super Natural would remain a MuscleTech distributor. Ms. Calvy stated that to be the case at the preliminary injunction hearing held before this court, both parties expected Super Natural's sales of MuscleTech products to keep increasing, and Muscle-Tech recognized in its internal documents that its increasing volume discount levels might force some distributors to develop greater warehousing needs. Looking at the evidence in the light most favorable to the non-movant, the court must conclude that at least some of the expense of the new warehouse is attributable to the Super Natural–MuscleTech relationship.

Even taking the plaintiff's argument at face value, however, it does not appear that any of the investment in the larger warehouse was truly "sunk." MuscleTech continued to supply Super Natural with goods for five of the fourteen months of the lease and Super Natural's income statements show that the distributor earned substantial profits during that period. Even if the court were to consider the entire additional cost of the new warehouse attributable to the MuscleTech relationship, the $168,000 incurred to rent the larger space is dwarfed by the profit Super Natural earned on MuscleTech products in the final eleven months of 2000.[18] During those months Super Natural earned $512,697 on sales of $3,763,934 worth of MuscleTech products.[19] Even backing out

the roughly $179,000 in profit derived from M Olympus-sourced goods, Super Natural more than made up its investment.

The situation faced by the court is like that in *Beloit Beverage Co. v. Winterbrook Corporation,* 900 F.Supp. 1097 (E.D.Wis. 1995), where the court found that a beverage distributor had dedicated no sunk costs to its relationship with the La Croix mineral water company despite dedicating 20–25% of its warehouse space to the product—a much larger percentage than shown here, the court might add—because the distributor had already recouped its investment in the space via past profits on the beverage. Similarly, the court in *Beloit Beverage* noted that the space was fungible and could be dedicated to other uses, thus mitigating any inference that the investment was "grantor specific," and therefore "sunk." *See id.* at 1109. Super Natural has already begun the process of dedicating the space formerly taken up by MuscleTech goods to hundreds of new products, proving that warehouse space truly is fungible and seldom a sunk cost. Whatever costs Super Natural may have incurred renting additional space weigh lightly in the totality of circumstances the court must consider when determining whether a community of interest existed between it and MuscleTech indicative of a dealership.

Super Natural's other claimed costs meet the same fate. Even taking as true Ms. Calvy's assertion that she would not have invested in a permanent trade show booth absent the MuscleTech line (another contention that may not be reasonable in

---

**18.** Due to a bug in Super Natural's accounting software, the distributor was unable to provide the court with financial records pertaining to individual lines from January of any year.

**19.** These are gross profit figures derived by comparing the sales price of the MuscleTech

goods with the purchase price. Net profits are calculated by deducting overhead costs, such as the rent at issue here, from the gross profit figures. Aside from the "investment" described in this section, Super Natural has identified no specialized overhead costs suggesting MuscleTech was anything less than a strong money-maker for the distributor.

light of the fact she represented at least a dozen manufacturers in the booth), the $40,000 invested to do so was *de minimus* for a $23 million company and more than recouped in profits made off the Muscle-Tech line. *Cf. Cabinetree*, 914 F.Supp. at 301 (sunk investments totaling 2% of company's annual sales were *de minimus* and legally insignificant in determining whether a community of interest existed).

The third sunk cost claimed by Super Natural is the expense of registering for and traveling to five trade shows a year. No evidence—not even a self-serving affidavit—has been presented that attendance at these shows was "MuscleTech-specific" or that Super Natural would not have attended these shows absent MuscleTech's encouragement, however. Indeed, the fact Super Natural attended five annual trade shows even when MuscleTech amounted to less than 1% of Super Natural's sales would belie such an assertion had it been made. Further, no evidence has been presented that the cost of these shows outweighed the profits derived therefrom. Trade show attendance was not a "sunk" investment and, if it was, it was not an investment specific to the MuscleTech line. The court will give this investment little, if any, weight when balancing the totality of the circumstances.

The only other "investment" Super Natural claims to have sunk into the Super Natural—MuscleTech relationship is good will (and possibly MuscleTech-specific training costs, though no evidence has been presented on that issue). Super Natural has made no attempt to quantify (or even elucidate) its investments in good will on behalf of MuscleTech, however, nor to distinguish those investments from any that may have been made on behalf of any of the more than 200 other manufacturers whose products it sells. Even if the court were to credit Ms. Calvy's self-serving statement that she gave "priority" to the MuscleTech line, what does that mean? As summary judgment is the "put up or shut up" moment in a lawsuit, *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir.1999), and Super Natural has failed to put up any evidence in support of its position on this point, the court will give no weight to Super Natural's alleged investments in good will, *cf. Sales & Marketing*, 57 F.3d at 607 (plaintiff "fails to explain why the investment in market development, promotion development, and goodwill is so extensive and unusual as to bring it within the spirit of the WFDL").

Even if a jury were to find that Super Natural's sales will decrease 13% as a result of the severance of the Super Natural–MuscleTech relationship, that the decrease is likely to lead to losses, and that Super Natural invested every penny it has claimed into the relationship, looking to the factors identified by the Seventh Circuit this court would find as a matter of law that the relationship was not so unique or exploitative as to create a community of interest. The percentage decrease in sales is moderate and not by itself indicative of a community of interest, *cf. Sales & Marketing*, 57 F.3d at 604 (no community of interest despite 13–36% of plaintiff's sales derived from alleged grantor); *Cabinetree*, 914 F.Supp. at 299 (no community of interest despite 12–25% of sales derived from alleged grantor); *C.L. Thompson*, 708 F.Supp. at 226 (no community of interest despite 15% of sales derived from alleged grantor), and Super Natural's allegedly grantor-specific investments were nominal in comparison to its sales and appear to have been fully recouped (at the very least, Super Natural has made no effort to show they were not recouped). The words of the Wisconsin Court of Appeals in a different WFDL case ring true here: the court has "no doubt but that the harm described ... will occur. But it will ... result pri-

marily from loss of [revenue as a result of a terminated distributorship], a loss which will occur in many terminated vendor-vendee relationships.... The fact is that [plaintiff's] stake in its distributorship is primarily in future profits, and that is not enough to distinguish it from a typical vendee." *Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 213, 507 N.W.2d 115 (Wis.App.1993); *Accord Sales & Marketing*, 57 F.3d at 607; *Cabinetree*, 914 F.Supp. at 301.

Looking to the additional "facets" of a potential dealership relationship identified by the Wisconsin Supreme Court in *Ziegler* does not change the court's conclusion:

## FACET 1—LENGTH OF THE RELATIONSHIP

Prior to MuscleTech's preliminary decision to terminate Super Natural in October 2000, the parties had dealt with each other for four years. The relationship continued another four months beyond that. This limited period of time weighs slightly against a finding of a community of interest.[20] *Cf. Guderjohn*, 179 Wis.2d at 213, 507 N.W.2d 115 (commenting on nearly four-year distributor relationship and stating, "[i]f duration has significance, it is this: [the] distributorship did not last long enough to cement interdependence between the parties").

## FACET 2—EXTENT AND NATURE OF THE PARTIES' CONTRACTUAL OBLIGATIONS

The parties did not have a written contract. Super Natural was free to sell the products of MuscleTech's competitors. As of April 2000, however, Super Natural was asked to give "priority" (an undefined

term) to the MuscleTech line and to carry the full line of MuscleTech products (something Super Natural had always done voluntarily). Further, Super Natural was asked not to sell to three specific sub-distributors. Most importantly (in Super Natural's view), as of an unspecified date Super Natural was required to sell $100,000 (and later $200,000) worth of MuscleTech product each month in order to receive the largest discounts available. Rightly or wrongly, Super Natural feared that it would be terminated if it did not consistently reach those sales figures. The court finds this factor to be neutral. While certain requirements appear to have been placed on Super Natural, they were requirements accepted voluntarily and none necessarily involved sunk costs. At any time Super Natural had the option to sell its remaining inventory (at a profit) and walk away from the relationship. *Cf. Kenosha Liquor*, 895 F.2d at 420 (no dealership when, among other things, defendant's product was only one of several "magnet brands" sold); *Cabinetree*, 914 F.Supp. at 299 (no dealership despite requirement that retailer purchase specified amount of product to remain an authorized seller); *Beloit Beverage*, 900 F.Supp. at 1108–1109 ("substantial" purchase, sales, and promotion obligations granted little weight in determining existence of a community of interest).

## FACET 3—PERCENTAGE OF TIME OR REVENUE DEDICATED TO THE ALLEGED GRANTOR'S PRODUCTS

Super Natural has not informed the court how much time or revenue it dedicated to promoting MuscleTech's products. Ms. Calvy estimates that her employees

---

**20.** Following the lead of every case of which the court is aware, the court will draw its own conclusions regarding what weight to give each facet. *See, e.g., Beloit Beverage*, 900 F.Supp. at 1108–1110; *Guderjohn*, 179 Wis.2d at 209–213, 507 N.W.2d 115. The facts, however, will be taken in the light most favorable to the plaintiff.

dedicated "thousands" of hours to the line. She has not informed the court what those hours entailed, how she reached her estimate, or how this expenditure of time compares to time spent promoting other products, however. Similarly, Ms. Calvy tells the court that she dedicated "resources" to securing shelf space for MuscleTech, but does not explain how that was accomplished or what resources were expended. Due to the lack of information, the court finds this to be a neutral facet: it neither supports nor discredits the existence of a community of interest.

## FACET 4—PERCENTAGE OF GROSS PROCEEDS OR PROFITS

Goods purchased from MuscleTech accounted for 12.5% of Super Natural's sales and 10.29%[21] of its profits in 2000. MuscleTech-sourced goods accounted for 7.63% of Super Natural's sales in 1999, 6.42% of its sales in 1998, and 0.85% of its sales in 1997.[22] The court finds these modest numbers neither so large as to be indicative of a community of interest, nor so small as to rule out the possibility. *Compare Guderjohn,* 179 Wis.2d at 209–210, 507 N.W.2d 115 (percentage of sales derived from alleged grantor of between 19 and 26% "tend to show a community of interest"), with *Beloit Beverage,* 900 F.Supp. at 1104 (gross profits of between 5.3 and 5.8% derived from alleged grantor's brand not indicative of a dealership relationship). On balance, however, the court finds this facet to weigh slightly against finding a community of interest. *Cf. C.L. Thomp-*

*son,* 708 F.Supp. at 226 (fact only 15% of plaintiff's sales derived from alleged grantor's products "strong evidence" that there was no community of interest).

## FACET 5—GRANT OF TERRITORY

MuscleTech granted Super Natural no exclusive territory in which to sell its goods. Super Natural was but one of 36 distributors to sell the brand in the United States. This evidence weighs against finding a community of interest. *Cf. C.L. Thompson,* 708 F.Supp. at 226 (no community of interest when, among other things, grant of territory was non-exclusive).

## FACET 6—PROPRIETARY MARKS

Super Natural did not use MuscleTech's proprietary marks on its own stationary or other materials. Super Natural only ever used MuscleTech's logo to promote the manufacturer's goods at trade shows. This evidence is counter-indicative of a community of interest. *Cf. Beloit Beverage,* 900 F.Supp. at 1109 (failure by putative dealer to use alleged grantor's proprietary marks on its own materials (letterhead, building, etc.) cuts against finding community of interest). *Compare Frieburg,* 978 F.2d at 400 (community of interest exists when, among other things, putative dealer displays alleged grantor's proprietary marks on its stationary, bank checks, business cards, brochures, and telephone directory entry).

**21.** This number is generated by taking 65% of the total 15.83% of profits derived from MuscleTech-branded products in 2000. (Super Natural has admitted that it generated 35% of its 2000 "MuscleTech" sales from goods purchased from M Olympus.) MuscleTech argues that the profit number should actually be lower than 10.29% because Super Natural was able to earn higher profits on the M Olympus goods than the official MuscleTech goods (suggesting more than 35% should be

deducted from the 15.83% figure). As no party has broken out the figures in a manner that would permit a more accurate determination, however, and the fact the court must take the facts in the light most favorable to the non-movant at the summary judgment stage of litigation, the court will stick with the 10.29% figure.

**22.** Profit break outs were not provided for years other than 2000.

## FACET 7—FINANCIAL INVESTMENT IN INVENTORY, FACILITIES, AND GOOD WILL OF THE ALLEGED DEALERSHIP

As discussed above, Super Natural undertook few, if any, non-recoupable investments specific to the MuscleTech line. Super Natural paid nothing to acquire its MuscleTech distributorship, for example. Further, Super Natural has not demonstrated how its alleged investment in generating goodwill for MuscleTech differed from investments undertaken on behalf of its numerous other brands. The court finds this facet to weigh slightly against finding a community of interest. *Cf. Guderjohn,* 179 Wis.2d at 210, 507 N.W.2d 115 (investments in inventory, as opposed to grantor-specific tangible assets, indicative of a vendor-vendee relationship, not a dealership one); *Beloit Beverage,* 900 F.Supp. at 1109–1110 (investments not indicative of community of interest because they were recouped); *Cabinetree,* 914 F.Supp. at 301–302 (investments not indicative of community of interest because non-recoverable portion was small in comparison to overall sales). *Compare Frieburg,* 978 F.2d at 400–401 ($70,000 investment in new building indicative of community of interest because undertaken at alleged grantor's request and contrary to putative dealer's own interests).

## FACET 8—PERSONNEL DEVOTED TO THE ALLEGED DEALERSHIP

Super Natural dedicated no personnel exclusively to the MuscleTech line. As the company has not provided the court with information showing hours spent by Super Natural employees on MuscleTech business per year the court cannot even extrapolate a number of equivalent "employee years." *Cf. Beloit Beverage,* 900 F.Supp. at 1101 (finding 13,208 hours dedicated to defendant's product to be equivalent to between six and seven full-time employees). The court finds this facet to tip slightly against finding a community of interest. *Cf. Cabinetree,* 914 F.Supp. at 302 (no community of interest despite fact plaintiff hired additional salespeople in anticipation of increased sales of defendant's product; salespeople were trained to sell all lines and no salespeople were dedicated exclusively to defendant's line).

## FACET 9—PROMOTIONAL EXPENSES

Super Natural undertook two MuscleTech-specific promotions and placed one MuscleTech ad in its catalogue at its own expense. No evidence has been provided regarding the actual cost for these activities, though. Similarly, no evidence has been provided regarding the cost incurred to mail MuscleTech promotional items to retailers, though Super Natural asserts that it did this, too. The only hard evidence Super Natural has provided the court regarding promotional expenses is that the distributor spent $74,623 on trade show attendance in 2000 and $40,000 on a new permanent trade show booth. Viewing the evidence in the light most favorable to the non-movant, the court will attribute a large percentage of the former (50%, even though MuscleTech was but one of over a dozen manufacturers represented at the shows by Super Natural) and all of the latter to the alleged dealership. Thus, the court is presented with evidence of $77,312 in promotional expenses during the last full year of the Super Natural–MuscleTech relationship. It is important to recall that while MuscleTech may have encouraged these expenditures, it never requested that they be made nor was consulted about them. Further, if one recalls that Super Natural did more than $22.8 million in sales in 2000 ($2,282,409 in MuscleTech-sourced items), one quickly realizes that $77,312 is not a particularly large

promotional budget. It amounts to just 0.34% of Super Natural's total sales and 3.39% of its sales of goods purchased from MuscleTech. Similar promotional budgets are common in simple vendor-vendee relationships. The court finds this facet to weigh slightly against finding a community of interest. *Cf. Beloit Beverage,* 900 F.Supp. at 1110 ($70,000 in promotional expenses is "relatively insignificant in the context of a $2 million line of business"); *Cabinetree,* 914 F.Supp. at 301 (discounting advertising expenditures because alleged grantor had no control over and no direct participation in the putative dealer's advertising process).

## FACET 10—SUPPLEMENTARY SERVICES

The only supplementary service provided by Super Natural to its MuscleTech customers involved answering an unidentified number of retailer questions regarding the brand. This facet weighs against finding a community of interest. *Compare Frieburg,* 978 F.2d at 400 (finding community of interest, in part, because plaintiff serviced and repaired alleged grantor's products).

■ When one weighs all the factors identified by the Wisconsin Supreme Court one finds that although few of the factors weigh decisively against finding a community of interest, *none* of the factors weigh in favor. And this analysis fails to take into consideration an issue the court considers extremely relevant: aside from conclusorily stating that it gave MuscleTech "priority" status and noting that it did not participate in any dealer display contests for other manufacturers, Super Natural has not demonstrated that its relationship with MuscleTech was significantly different from its relationships with any of its other suppliers. As the Wisconsin Supreme Court has noted, a community of interest (and, by extension, a dealership relationship) involves a "cooperative effort more significant than that in the typical vendor-vendee relationship." *Ziegler,* 139 Wis.2d at 604, 407 N.W.2d 873. Super Natural has made only the most minimal attempt to show that it cooperated more with MuscleTech than any of its regular vendors.[23] Adding this "facet" to the ten

---

**23.** Super Natural tries to make an issue of the fact its promotional strategy of attending trade shows complemented MuscleTech's independent promotional efforts. This point, which does not fit well into any of the "facets" identified by the Wisconsin Supreme Court but which may be relevant to the larger issue of cooperation, does not change the court's analysis. To begin with, complementary activity does not necessarily suggest cooperation. Even assuming it did (perhaps a jury could make that inference), the same point could be made of any manufacturer that focused most of its promotional activities on end-users rather than retailers. Super Natural has failed to show that this "complementary" promotional strategy differed in any way from that employed on behalf of Super Natural's regular vendors.

Similarly, Super Natural dedicates a great deal of argument to the fact MuscleTech's internal documents indicate a desire to increase the manufacturer's "expectations" of its distributors beginning in late 1999 (another point perhaps not easily addressed in the ten standard facets). To the extent these increased expectations resulted in increased obligations, the court has already considered their effects and found them non-indicative of a dealership. To the extent they did not, no evidence has been presented that the greater expectations resulted in significantly increased levels of tangible cooperation. The only component of this new "cooperation" that might be unique from that expected in a typical vendor-vendee relationship is that MuscleTech asked Super Natural not to sell to three specific subdistributors. This small quirk is not enough to create a dealership relationship, however. Dealerships are marked by exploitation—the imposition of obligations not otherwise in the putative dealer's own interest. *See, e.g., Cabinetree,* 914 F.Supp. at 300. Declining to help three competitors was in Super Natural's own best interests, as was nearly every other example of cooperation highlighted by Super Natural. The court simply cannot say that the Super

identified by the Wisconsin Supreme Court, the court has little difficulty finding that Super Natural and MuscleTech did not share a community of interest and that their relationship therefore was not a "dealership" protected by the WFDL. MuscleTech is entitled to summary judgment on Super Natural's WFDL claim.

■ Even were the court to hold that, if taking the facts in the light most favorable to the non-movant, Super Natural might be a MuscleTech dealer (which it most certainly has not) summary judgment still would be required because Super Natural has not shown facts permitting a reasonable inference that it was a *Wisconsin* dealer protected by the WFDL. The WFDL defines a dealer as a "person who is a grantee of a *dealership* situated in this state." Wis. Stats. § 135.02(2) (emphasis added). As the Wisconsin Supreme Court has explained, this language requires a reviewing court to evaluate "not the location of the dealer," but the nexus between the state and the obligations incurred as a result of the relationship. *Baldewein*, 233 Wis.2d at 70, 606 N.W.2d 145. "The inquiry should focus on the nature and extent of the dealership's development of, investment in and reliance upon the Wisconsin market." *Id.* at 75, 606 N.W.2d 145.

In one leading case the Wisconsin Court of Appeals easily concluded that despite being physically located in the state, the Swan Sales Corporation was not a Wisconsin "dealer" protected by the WFDL because all of its sales of the alleged grantor's products occurred outside the state's borders. *See Swan Sales Corp. v. Jos. Schlitz Brewing Co.,* 126 Wis.2d 16, 374 N.W.2d 640 (Ct.App.1985). In *Baldewein* the Wisconsin Supreme Court acknowledged this case but instructed that proper analysis should not focus solely on percentage of sales inside the state. Courts should also consider:

> 2) how long the parties have dealt with each other in Wisconsin; 3) the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin; 4) the extent and nature of the grant of territory in this state; 6) the extent and nature of the use of the grantor's proprietary marks in this state; 7) the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the dealership in this state; 8) the personnel devoted to the Wisconsin market; 9) the level of advertising and/or promotional expenditures in Wisconsin; and 10) the extent and nature of any supplementary services provided in Wisconsin.

*Baldewein,* 233 Wis.2d at 75, 606 N.W.2d 145.[24] The court did not suggest in any way that *Swan Sales* had been decided incorrectly, however.

The list of factors enumerated by the Wisconsin Supreme Court for evaluating whether a dealership is "situated in" this state should be familiar: they are mere variations on the "facets" previously adopted for determining whether a dealership exists at all. The relevant facts and analyses are thus largely identical to those already considered. Two key facts must be added to the equation, however: Super Natural generates less than 1% of its total sales in Wisconsin and has not presented any evidence that it has undertaken efforts to develop the Wisconsin market for MuscleTech or any other manufacturer. Borrowing the court's previous analysis, then, not only do no factors weigh in favor of finding a Wisconsin dealership, at least

---

Natural–MuscleTech relationship involved the type of opportunity for exploitation contemplated by the WFDL.

**24.** The original text of the Wisconsin Supreme Court decision contained no factor numbered 5.

two factors weigh strongly *against* making such a finding. Indeed, the situation faced by the court is little different from that in *Swan Sales* where the WFDL was found not to apply. The lack of disputed facts supporting an inference that the Super Natural–MuscleTech relationship was "situated in" this state even if it was a "dealership" necessitates summary judgment in MuscleTech's favor.

## CONCLUSION

A court "must be able to distinguish a dealership from a vendor-vendee relationship" before the special protections of the WFDL may be applied. *Cabinetree*, 914 F.Supp. at 302 (citing *Ziegler*, 139 Wis.2d at 608, 407 N.W.2d 873). Even taking the facts in the light most favorable to the non-movant, the current record provides no evidence from which the court would find that the Super Natural–MuscleTech relationship was so unique that the two companies shared the requisite community of interest to fall within the WFDL's protection. Since Super Natural has not presented sufficient facts to create a triable issue on this point, the court will enter partial summary judgment in favor of MuscleTech. Super Natural's WFDL claim will be dismissed on the merits.

Accordingly,

**IT IS ORDERED** that MuscleTech's motion for partial summary judgment be and the same is hereby **GRANTED;** and

**IT IS FURTHER ORDERED** that Super Natural's WFDL claim be and the same is hereby **DISMISSED** on the merits.